[Crim. No. 1648. Third Appellate District.—April 14, 1939.]

THE PEOPLE, Respondent, v. HENRY YUEN et al., Appellants.

George R. Andersen, Herbert Resner and George G. Olshausen for Appellants.

Earl Warren, Attorney-General, and J. Q. Brown, Deputy Attorney-General, for Respondent.

PULLEN, P. J.—These defendants were charged by an information with the crime of riot, a misdemeanor. They were tried by a jury, and a verdict of guilty as charged was returned against them. From the judgment of conviction and the order denying a motion for a new trial they now appeal.

The information charges in the following words:

" . . . that on or about the twentieth day of January, 1938, in the County of Nevada, State of California, they did wilfully and unlawfully acting together and with one Grant Spear, and without authority of law, used force and violence, disturbed the public peace, and threatened to use force and violence, which said threats were accompanied by immediate power of execution."

Briefly, it appears that on January 14, 1938, a strike was called by certain mine, mill and smelter workers against the Murchie Mine, situated near Nevada City in Nevada County, and a picket line was established at a point where the road leading to the mine joins the main highway. This picket line, made up of from 60 to 80 men, was continued until the morning of January 20th, when the offense for which the defendants stand convicted occurred.

At about 7 o'clock on the morning of that day Sheriff Tobiassen, together with several of his deputies and state highway patrol officers proceeded to the junction of the main highway and the Murchie Mine road. The men on picket duty were grouped along the side of and across the Murchie Mine road, and the officers were apparently on the main highway nearby. In a short time a caravan of automobiles bearing mine workers made its way from Nevada City along the highway, and when it arrived at the junction of the two roads, the first car in line stopped, causing the following cars also to come to a stop. There is a dispute as to whether this first car stopped voluntarily or whether it was forced to stop due to the acts of the defendants. The sheriff testified that the first car turned up the Murchie Mine road about 100 feet and stopped. Immediately in front of this car when it stopped, was about 75 or 80 striking miners in close formation across the road, and they caused the car to stop. This testimony is amply supported by other reliable testimony.

In this picket group, among others, were defendants Circle, who was immediately in front of the car, and Vassion and Yuen, who were standing in the road and very close to the right side of the car. The sheriff then informed the group that he was there in his official capacity, and told them they constituted an unlawful assemblage and ordered them to disperse. He heard Vassion say, ''Come on boys, we can't let them go through. We will die first. President Roosevelt is behind us, and we stand on our constitutional rights. They shall not go through; we will die first.'' The sheriff then saw Vassion pick up a rock while others seized the running board of the automobile and raised the car off the ground in an attempt to upset it. Circle then shouted, ''Tip the damned thing over,—they won't go through.'' Witnesses, including the sheriff, testified they saw the hood of the car raised, and saw Yuen at that time throw water on the motor, and saw Vassion throw a rock through the windshield, striking one of the occupants. Others saw Zderich throw rocks at the officers. A pine log was then thrown across the roadway. Other witnesses saw Yuen throwing rocks under the car, letting air out of the tires, and attempting to plug up the exhaust pipe. Circle was seen trying to lift the car over or push it back, exhorting the men to stand on their rights. Vassion, in addition to throwing rocks also attempted to open the car door. The other defendants were also seen engaged in similar acts of lawlessness. The sheriff threw a gas bomb in the group, and at the same time directed his officers and the highway patrol to clear the road, which was quickly done.

The defendants testified that in the sheriff's car were several guns of various types together with several gas bombs, and attempted upon that account to find fault with him for being thus prepared for an emergency. As to that and to the apparent self-control of the sheriff under great provocation, no criticism can be directed nor to the acts of any of his men. They were officers of the law engaged in assisting persons lawfully entitled thereto, to pass along the Murchie Mine road without let or hindrance. These defendants had purposely gathered on the Murchie Mine road to test the power and temper of the officers of the law. That the officers were sufficiently able to cope with the situation is to their credit.

Upon the conviction of these defendants, after a trial lasting approximately 10 days, four days of which were consumed in obtaining a jury, they were found guilty as charged. Their applications for probation were denied, and these defendants were then sentenced to fines and imprisonment from which this appeal is taken.

As grounds for reversal of the judgment and order, appellants set forth these nine specifications of error:

1. The court erred in denying a change in venue;

2. The jury was in the custody of the sheriff, who was a witness and whose acts were an issue at the trial;

3. Erroneous denial of challenges for cause;

4. Misconduct of the trial judge;

5. Erroneous rulings on evidence;

6. Refusal of a vital instruction;

7. The evidence was insufficient to support the verdict against defendant Zderich;

8. The evidence was insufficient to support more than disturbing the peace against any defendant;

9. Legal errors and disqualification of judge resulting in denial of due process of law at the sentencing of defendants.

We will consider such specifications in the order named.

■ As to the order denying a change of venue, we find no error. Some six or eight affidavits were presented, two by defendants herein, alleging instances of threats and bodily harm to affiants, if they did not leave town, etc., and gave details as to the clash between the pickets and the officers on the morning of January 20th; and averring that there was an organized group of vigilantes in Nevada County, intimidating these affiants and others. There was also received in evidence copies of two local newspapers, the Union and Nugget. Upon this showing the court denied the motion for a change of venue, without prejudice. Some ten days thereafter, and after partial selection of the jury, the motion was renewed and again denied.

The affidavits failed to show any widespread hostility toward these defendants. It is true that the affidavits related instances of these defendants being accosted by strangers in the streets and ordered to leave the city, but who these persons were and how numerous, or acting under whose instigation, or how widespread, is not shown. It might have been

and probably was, a group as small and as partisan as that of the defendants, and were purposely attempting to make it appear they represented the spirit of the entire community. Whether or ·not these defendants could have obtained a fair trial rested largely in the discretion of the trial court, and will not be disturbed unless abuse thereof is shown.

Appellants attempt to show that a concerted attack was being made upon the labor organization known as Congress of Industrial Organization by an organized group of citizens, but the record does not bear out the charge. These defendants were not accused of being members of any organization, nor was criminal syndicalism an issue. The only issue before the court was the charge of rioting. The contention that there was an organized group of vigilantes in Nevada County is not established. It does not appear what the vigilantes were, nor for what they were contending, nor how strong numerically they were in the community. As far as the record discloses the so-called vigilantes may have consisted of a very few individuals, acting upon their own initiative, contrary to the ideas of the large bodies of law-abiding citizens of that county. Until further facts are shown neither the trial court, nor can this court hold that such a course of conduct as set forth in the affidavits would prevent defendants from having a fair and impartial trial. It is not sufficient to show that there was some excitement in the county, nor that personal encounters took place upon the streets in certain isolated instances.

Even when we consider the renewed motion after a partial impanelment of the jury we cannot say that defendants were entitled to a change of venue. Upon the *voir dire* it appeared that some of the jurors had formed an opinion which they readily admitted, and were promptly excused. Others had discussed the occurrences of the rioting with their friends and neighbors, and had read articles and accounts thereof in the public press, but said they could nevertheless act impartially upon the evidence. It is a matter of general knowledge that in instances of this kind many citizens are seeking to avoid jury duty, and if they can do so by relying upon a fixed opinion, they are inclined to seize upon that as an opportunity to avoid jury duty. The fact that so many prospective jurors voluntarily disqualified themselves is an indication that they were not seeking to become members of

the jury, as they could have done if they were trying to qualify as jurors in order to convict these defendants.

From an examination of the entire record we find no error in the refusal to grant the order for a change of venue, nor an abuse of the discretion vested in the trial court in denying such motion.

■ The second ground is that it was error to place the jury in charge of the sheriff. The record shows, however, that the jury, upon retirement, were delivered into the care of two men, as to whom no objections were made.

■ The next ground of error is the denial of certain challenges for cause, addressed to certain jurors. These prospective jurors admitted having an opinion, but it, they said, could be laid aside. Other opinions were based upon conversations with others, or what had appeared in the local press. Mr. Nye admitted having discussed the riot of January 20th, with a great many people, none of whom, however, were, as far as he knew, actual witnesses to any of the events. He did mention the matter to Sheriff Tobiassen, although he had no discussion with him. In the case of Mr. Sutton, he had had numerous discussions with neighbors and members of his family, but characterized such discussions as gossip. As to Mr. Stennett, he could not recall with whom he had discussed the case; that he had formed an opinion therefrom, but he could set it aside and grant the defendants a fair trial. This juror was subjected to a long and sometimes involved examination; the answers to questions in some instances might be deemed disqualifying while other answers seem to qualify the juror, he stating that he could lay aside any prejudice or preconceived opinion, and decide the case solely upon the evidence. ■ It is claimed that Juror Harnden was disqualified because he had been previously summoned by the coroner, who was himself later disqualified as an elisor but Mr. Harnden had been again summoned by a qualified elisor. Such a circumstance does not disqualify a juror. That situation arose and was commented upon, although not decided, in the case of *People* v. *Yoakum,* 53 Cal. 566, and was directly passed upon in *Woolfolk* v. *State,* 85 Ga. 69 [11 S. E. 814]; *State* v. *Yordi,* 30 Kan. 221 [2 Pac. 161]; *Hisaw* v. *State,* 13 Okl. Cr. 484 [165 Pac. 636], and the reasons there given are acceptable to this court.

■ Mr. Manuell was working in the department of streets and water works of the city of Grass Valley, and was a special peace officer of that city. He was not deputized by the sheriff, nor did he receive any orders from the sheriff. He was challenged under section 1074 (2) of the Penal Code, but the facts do not support the challenge.

Mr. Still testified he had formed an opinion based upon general conversations, but could set such opinions aside and decide the case upon the evidence.

About seventy-five pages of appellants' opening brief are devoted to citations of errors and misconduct by the trial judge, who is accused of being partisan and indicating a belief in the guilt of the defendants, expressions of opinion derogatory to the interest of defendants, interruption of defendants' counsel, unnecessary brusqueness and sarcasm toward defendants and their counsel, sustaining objections to questions asked of defendants where no objections were interposed, errors in admission and rejection of evidence, and in refusing certain instructions. It is also claimed the judge was disqualified to pass sentence, and that he denied probation solely because defendants had entered pleas of not guilty.

■ It would extend this opinion unduly to consider in detail these many citations of error. This cause required several days of trial. Counsel were vigorously representing their clients in every stage of the proceeding, and perhaps the relationship between court and counsel at times became somewhat strained, but nothing was said or done by the court that could be construed as misconduct nor that could have adversely affected the rights of defendants. At times, too, the case was apparently dragging, and an undue amount of time and emphasis was being given to minor matters. It is to be noted that these defendants were on trial for merely a misdemeanor, yet some ten days were consumed in the trial of the case. Upon several occasions the court interrupted both the attorneys for the People and for the defendants, to ask questions for the purpose of eliciting material points. This was within the power of the court, and no error can be based thereon. Defendants seem to assume that the trial of this case was a contest between counsel, and that the rules of the game were more important than the development of the facts. Assuming that the court did cut

short certain lines of examination, the facts were before the jury, and quite evidently time was saved thereby. It is quite evident also that in several of the instances where the court took a hand in the examination the particular witness was deliberately evasive and inclined to quibble. We find no error in this assumption that the court was guilty of partisan cross-examination. It is also charged the court sustained objections, which in fact were not made. The court is no longer confined, if such ever was the rule, to the role of sitting as a mere arbitrator between opposing counsel. It is the function of the court to see that errors or extraneous matter are not brought into the case, which might have the effect of clouding the issue or confusing the jury. Where improper questions are asked the court is acting within the proper scope of its duty in striking out the offending question whether or not objections had been previously made thereto.

Certain rulings upon the admissibility of evidence are also cited as error. In one instance a witness stated "the sheriff lost his head completely". This was properly stricken out as clearly being the conclusion of the witness. The facts could have been detailed as they later were, from which the jury could and probably did draw their own conclusions. Upon another occasion counsel for defendants offered to prove by the sheriff that he had an agreement with certain persons, not mentioned, to break the picket line and escort the strikebreakers to the mine. Upon this offer the court very properly refused to rule, stating he would pass upon each question as propounded to the witness. So, also, an attempt to show that certain of the sheriff's deputies destroyed a news reporter's camera and films, containing negatives of events occurring between January 20th and April 5th, claiming such conduct indicated a general conspiracy on the part of the sheriff and deputies to unlawfully break the strike. This evidence was not relevant, nor would the pictures if offered for such purpose, have been admissible. Neither the sheriff nor his deputies were on trial. They were peace officers, sworn to uphold the law, and we must assume they were doing their duty and not conspiring to break the law.

Appellants largely based their defense upon the theory they were engaged in peaceful picketing and that the offi-

cers of the law exceeded their authority in dispersing them. They attempted to justify their resistance upon the ground that they were entitled to resist an unlawful attack upon them by the sheriff. That, however, is not the law. It is the duty of a citizen to obey the commands of a peace officer given in his line of duty. If the officer is exceeding his authority, the recourse of the citizen is to the courts and not to open resistance. The course of conduct contended for by defendants would result in a breakdown of all law and order. So, too, the sheriff and his deputies were justified, prior to the morning of January 20th, in studying the various methods which might be employed to disperse the picket line if their orders were ignored, and such officers are not to be censured for their preparation to meet possible or anticipated violence. The fact that they armed themselves with the necessary implements to compel obedience to their commands, was within their province.

■ The court properly refused to give the following instruction upon two grounds: First, upon the ground that the subject was covered in an instruction already given; secondly, that the proposed instruction is objectionable in that it justified the secondary boycott.

"Defendants instruction No. X. You are hereby instructed that the right of united labor to strike in furtherance of trade interests is fully recognized. The reason for the strike may be based upon the refusal to comply with the employees' demand for the betterment of wages, conditions, hours of labor, in the discharge of one employee, or the engagement of another—in brief, in any one or more of the multifarious considerations which in good faith may be believed to tend toward the advancement of the employees. After striking, the employees may engage in a boycott or maintain a peaceful picket line. They may induce others sympathetic with their cause by fair oral or written persuasions or withdraw their social intercourse and business patronage from the employer. They may persuade other workers to respect their picket line and not work for the employer. They may use moral intimidation and coercion of threatening a like boycott of others if the latter do not withdraw their patronage from or refuse employment by the employer."

The court, in Instruction No. XII also properly modified that instruction by informing the jury the use of physical force and violence was not peaceful picketing.

 Appellants claim the evidence was insufficient to justify any verdict against defendant Zderich, claiming he did nothing until after he was gassed. Whether Zderich engaged in the scuffle before or after the gas was discharged in the midst of the picketers is immaterial, for as we have heretofore stated, it was not for them to determine whether or not the sheriff was acting within the limits of his authority and to attempt to meet the order to disperse with force. Sections 726 and 727 of the Penal Code provide:

"Where any number of persons, whether armed or not, are unlawfully or riotously assembled, the sheriff of the county and his deputies, the officials governing the town or city, or the justices of the peace and constables thereof, or any of them, must go among the persons assembled, or as near to them as possible, and command them, in the name of the people of the state, immediately to disperse.

"If the persons assembled do not immediately disperse, such magistrates and officers must arrest them, and to that end may command the aid of all persons present or within the county."

The sheriff acted under these sections. He thrice ordered the men to disperse. They were, to the number of 75 or 80, in close formation extended across the road to the mine. Zderich was one of that assemblage. Upon command of the sheriff he, with others, refused to clear the road, and were united in refusing to disperse.

So, also, every physical fact impels to the conclusive belief that these men were acting in concert. In fact the rallying cry of Circle was, "Hold the line." "Tip this car over;" and that of Vassion, "Hold the road; don't let them open it," clearly indicated a concert of action, for each of these defendants is placed by witnesses in the picket line across the road, and were particularly engaged in some active and overt act.

 Appellants claim they were not unlawfully assembled and therefore the order of the sheriff to disperse was without authority. The implied finding of the jury was to the contrary. Upon the occasion in question some 75 or 100 men had gathered to prevent others continuing their

work at the mine. The pickets were not parallel to the road but were in close formation across the road. It does not require 75 miners to peacefully picket a narrow roadway. Peaceful picketing does not contemplate the stopping of cars or individuals; if they wish to voluntarily stop and listen to the arguments of the pickets that is proper, but if one is coerced, either by violence or threats of violence or intimidation or annoyance or by the mere presence of numbers, such is not peaceful picketing.

Appellants point to the fact that no physical violence had occurred on the picket line prior to the morning of January 20th, but it is also stated that no underground miners had attempted to go into the mine except on a Sunday to attend a meeting. The conduct of some of these defendants on the morning of January 20th does not lend much support to the contention that this body of men were on a twenty-four hour picket line merely to peaceably discuss with their fellow employees working conditions in the Murchie Mine. We rather believe, as apparently did the striking miners, that it was not advisable for one to differ too radically from the views of the 75 pickets. Desiring to return to work, it may be presumed they asked the sheriff for protection, which was their right.

Lastly, it is claimed the trial judge was disqualified in imposing sentence upon these defendants upon the grounds urged in a motion for disqualification filed and heard prior to the commencement of the trial, and secondly, because it is claimed the judge adhered to a rule that probation would be granted only after a plea of guilty. This last charge we think is answered in the statement of the court at the time of imposing sentence, as follows:

"It is well settled that the matter of granting or denying probation rests in the sound discretion of the court.

"The facts and circumstances which move the court in the exercise of that discretion are numerous and varied. For instance, if the defendant is convicted after trial by a jury or the court, and the evidence of his guilt is very strong and there are no mitigating circumstances, the chances of securing probation are far less than if such defendant had pleaded guilty to the charge. This is only one of the many factors which influence the court in the exercise of its discretion. Others to be considered are the nature and character of the

offense and the attitude of the defendant at the trial and the strength of the case made out against him.

"This court has never laid down the hard and fast rule that probation will not be granted after trial under any circumstances. The records of this court will show that it has granted probation after trial by jury. Each application must be considered by itself. No two are ever exactly the same."

From this statement it is apparent that probation was not denied solely upon the ground that defendants had not entered pleas of guilty. There is no doubt that an application for probation is addressed to the sound discretion of the trial court, and in view of the circumstances here shown we find no such abuse. The sentences were not harsh nor excessive, and the record clearly indicates the guilt of these defendants, and discloses no valid reason upon which they could base any plea for probation.

After a careful examination of this lengthy record we find nothing therein justifying a reversal of the judgment or order. The judgment and order must therefore be affirmed. It is so ordered.

Thompson, J., and Steel, J., *pro tem.*, concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 12, 1939, and the following opinion then rendered thereon:

THE COURT.—In denying the petition of the appellants for a hearing herein after decision by the District Court of Appeal we withhold approval of the conclusions of law contained in the following portion of the opinion appearing, *ante,* p. 161 [89 Pac. (2d) 438]:

"They attempted to justify their resistance upon the ground that they were entitled to resist an unlawful attack upon them by the sheriff. That, however, is not the law. It is the duty of a citizen to obey the commands of a peace officer given in his line of duty. If the officer is exceeding his authority, the recourse of the citizen is to the courts and not to open resistance."

The petition for a hearing is denied.

Houser, J., voted for a hearing.