[Crim. No. 5291.   In Bank.   July 22, 1952.]

THE PEOPLE, Respondent, v. HENRY FORD
McCRACKEN, Appellant.

George H. Chula, James C. Monroe and Kal W. Lines for Appellant.

Edmund G. Brown, Attorney General, Frank Richards, Deputy Attorney General, James L. Davis, District Attorney (Orange), and Robert P. Kneeland, Assistant District Attorney, for Respondent.

SPENCE, J.—By an indictment returned by the grand jury of Orange County, defendant was charged in three separate counts with the crimes of (1) child stealing (Pen. Code, § 278), (2) kidnapping (Pen. Code, § 207), and (3) murder (Pen. Code, § 189) of Patricia Jean Hull, aged 10 years. The crimes were alleged to have been committed on May 19, 1951. The indictment was returned on May 25, 1951, and on June 8, defendant was arraigned and entered pleas of not guilty and not guilty by reason of insanity.

On the day set for trial, July 9, 1951, defendant moved for a change of venue on the ground that the people of Orange County were so prejudiced against him that a fair and impartial trial could not be had in that county. He also moved for a continuance. Both motions were denied, and trial proceeded on July 9. During the course of trial defendant moved for leave to file "Sexual psychopath papers" (Welf. & Inst. Code, § 5500 et seq.), to which motion the

prosecution objected and the objection was sustained. On August 2, the jury returned verdicts of guilty on count one (child stealing) and not guilty on count two (kidnapping). The jury was unable to agree on count three (murder), and the matter was set for retrial on August 13, 1951. Prior to the retrial defendant again made motions for a change of venue and a continuance, which motions were denied. The second trial resulted in a verdict of first degree murder without recommendation.

On October 8, 1951, defendant was tried on his pleas of not guilty by reason of insanity on counts one (child stealing) and three (murder). The jury returned verdicts finding defendant sane at the time of the commission of both crimes. On October 26, 1951, after denial of defendant's motion for hearing and determination of his status as a sexual psychopath (Welf. & Inst. Code, § 5501, subds. (a) and (c)) and his motion for a new trial, the court pronounced judgment and imposed the death penalty. This is an automatic appeal. (Pen. Code, § 1239(b).)

No contention is made that the evidence is insufficient to sustain the verdict. As principal grounds for reversal, defendant makes these contentions: (1) that prejudicial error was committed in the denial of a change of venue; (2) that the statutory procedure provided for determination of a "sexual psychopath" is unconstitutional in circumscribing the right to a jury trial (Welf. & Inst. Code, § 5501, subd. (c)); and (3) that the trial proceeded in a biased atmosphere.

On May 19, 1951, Patricia Hull, with her two younger brothers, attended a matinee at the Valuskis Theatre in Buena Park. Defendant had also gone to the theatre about 2 o'clock that afternoon. Between 5:30 and 6:00 p. m. that day, he and a girl resembling Patricia Hull were seen entering his auto court cabin.

When Patricia failed to return from the theatre in the late afternoon, her parents began making private inquiry for her, and on the next day, after their report to the sheriff's office, a full scale search was begun. On May 24, 1951, her body, fully clothed, was found in a shallow grave in Live Oak Canyon, some 35 miles from Buena Park. Live Oak Canyon is in a mountainous area adjacent to O'Neil Park, a county project on which defendant had worked on different occasions. A yellow bedspread, identified as coming from defendant's cabin, was found buried about 50 feet from the

girl's grave. The autopsy revealed small bruises on the girl's arms and in the area of her thighs, dilation of her rectal orifice, some 15 gashes on her scalp at the back and sides, and three fractures of her skull. Dr. Raymond Brandt, the county autopsy surgeon, testified that the cuts and blows on the girl's head all appeared to have been delivered before death by a fairly sharp, weighted instrument, and that death was caused by consequent exsanguination. His findings and medical opinion as to the post-mortem examination were corroborated by Dr. Maurice Rice, a pathologist present at the performance of the autopsy.

Defendant, a musician, lived in an auto court cabin in Buena Park. A few days prior to May 19, 1951, he had arranged with one Lee Stradley, owner of a local café to play evenings in the latter's café upon request of the patrons. Stradley testified that at about 8:45 p. m. on May 19, defendant in a highly nervous state came to the café and asked to borrow Stradley's car for the purpose of making a short drive to his cabin; that Stradley loaned defendant the car upon the latter's promise to return within a few minutes; and that defendant did not return until about 1:45 o'clock the next morning, when defendant was still in a nervous and agitated state.

Defendant was taken into custody on May 20, 1951, and he repeatedly denied that he had ever seen the girl or that she had been with him in his cabin. A search of his cabin revealed human bloodstains on the floor of the bedroom and kitchen, strands of hair and bits of fiber from clothing identified as belonging to the girl, an apron appearing to have been recently rinsed of bloodmarks, and towels similar to one found near the road in Live Oak Canyon and on which there had been much human blood. Defendant's clothing worn on May 19 was bloodstained.

Defendant testified as follows concerning his acts on May 19: At the theatre that afternoon a girl, later identified as Patricia Hull, came and sat near him. After they had talked a little while and agreed to show each other where each lived, they left the theatre and walked to his cabin. He felt thirsty and went to the kitchen for a drink of water. While the girl was looking at some pictures in the front part of the cabin, a car approached and she, thinking the people were her neighbors, became panicky with the thought that they might discover her in defendant's cabin. Defendant tried to calm her and locked the door of the cabin. She

ran to the kitchen, climbed on the kitchen table, and tried to kick out the screen. In doing so, she stepped on a jelly glass, lost her balance and fell to the floor. Defendant went to the kitchen door, saw her lying on the floor, with considerable blood running from her head. He tried to holler for help, and the next thing he knew, he awoke under the bed. He then again went to the kitchen, where a great deal of blood had apparently accumulated in one corner from the girl's bleeding. He shook the girl's body but found no signs of life. He held her head under the faucet in the kitchen sink for some 20 minutes. He then reached for a towel from the kitchen cabinet and in the process he pulled down a flatiron. At that moment the landlady entered the kitchen. As she glanced about the room, she accused defendant of killing the girl, and he hit the landlady several times on the head with the iron. He then wiped up some of the blood that was still flowing from the girl's cuts and gashes, and hid her body behind the bed.

Believing this episode was a dream of some kind, defendant left the cabin and went to the café to see Stradley. On leaving the café in Stradley's car, he remembered the girl at the cabin. He returned there, took the girl's body wrapped in a yellow bedspread, and placed it in the back seat of the car. He drove to a hotel in Santa Ana in search of a friend with whom he wanted to do some business. Then he proceeded to his mother's home in Santa Ana, where he picked up a shovel to dig a grave, and continued to the O'Neil Park location, where he buried the girl's body and the yellow bedspread. He returned the shovel to his mother's home, stopped at his cabin for a few minutes, and proceeded to Stradley's café.

Dr. Brandt testified that it was his opinion that the cuts on the girl's head could not have been caused by falling onto broken glass. Three psychiatrists gave as their opinion that defendant's story, as related to them, contained much fabrication. Defendant introduced in evidence mental test findings showing that he had a low intelligence quotient but was not feeble-minded. There was also introduced on his behalf reports of medical examinations disclosing that defendant probably was a "sexual psychopath" and that on previous occasions he had been involved in molesting young girls.

On the trial of the insanity issue, the medical experts unanimously agreed that at the time of commission of the alleged

offenses defendant was legally sane. It was the theory of the prosecution that defendant's killing of Patricia Hull was not only premeditated and deliberate, but also was in perpetration of an act punishable under Penal Code, section 288.

Defendant's first contention is that the trial court committed prejudicial error in denying defendant's motion for a change of venue. The motion was supported by affidavits of defendant and his attorney in which it was averred that a fair and impartial trial could not be had in Orange County because the enormity of the alleged crime had aroused the anger and indignation of the people of that county resulting in bias and prejudice against defendant; that there had been sensationalized coverage of the homicide in local newspaper stories, as well as by television cameras showing interviews with many townspeople extending over several days and during which they gave their respective opinions as to defendant's innocence or guilt, all adding to the popular excitement over the alleged sex crime and aiding the prosecution's case through highly emotional statements; and that many of the citizens of the county agreed that strong local sentiment and feeling existed against defendant but were unwilling to execute affidavits to that effect for fear of suffering prejudice from any charge of association with defendant's case.

Counteraffidavits were filed (bank official, news bureau manager, Santa Ana Chief of Police, State Highway Patrol Officer, Orange County Sheriff, and Orange County District Attorney) whereby it was conceded that there was publicity and general discussion of the missing girl at the time of defendant's arrest and during the five-day search for her body. However, it was further averred that the newspaper accounts on the whole were fair and factual; that there were no threats of violence or molestation against defendant; that affiants had heard no statements which would lead them to believe that defendant could not have a fair trial in Orange County; that any exceptional public interest had largely subsided by the time the affidavits were executed, July 6, 1951, which was three days before the date of the first trial, July 9; and that defendant had been conducted several times along the public street from the county jail to the courthouse for various hearings and had not been subjected to any threats of violence. In addition, the district attorney's counteraffidavit referred to the numerous local citizens whom the

prosecution had subpoenaed as witnesses for the trial and the increased expense that would be incurred, as well as prejudice to the prosecution's case, if the venue should be changed. As above stated, defendant's motion for change of venue, as submitted on the conflicting affidavits was denied.

Prior to the commencement of the second trial, on August 13, defendant made another motion for change of venue, supported by affidavits of himself and his attorney. These affidavits largely repeated the averments made at the time of the first trial and, in addition, referred to various emotionally-slanted newspaper articles and pictures which appeared in the local newspapers during the first trial, including a statement by the district attorney to the press and given wide circulation, wherein he berated the jury for failing to convict defendant on the murder charge and expressed his opinion that the testimony was "sufficient on which to base a first degree murder verdict calling for the death penalty." A counteraffidavit was filed by the district attorney, wherein he reaffirmed his statements that defendant could have a fair trial in Orange County and that there had been no molestation or threats against defendant. He further asserted that the inability of the first jury to agree on a verdict on the murder charge demonstrated the fairness and impartiality of the people of Orange County in the matter. He also mentioned again considerations of convenience of the witnesses subpoenaed by the prosecution for the second trial, as well as the increased expense which would be incurred upon a trial of the case, in addition to the already large expenses involved.

Applications for change of venue are addressed to the sound discretion of the trial court. (Pen. Code, §§ 1033, 1035; *People* v. *Wallace*, 6 Cal.2d 759, 764 [59 P.2d 115]; *People* v. *Cullen*, 37 Cal.2d 614, 627-628 [234 P.2d 1].) It must be recognized that the type of crime here involved is one which is generally condemned and receives widespread publicity. But there was no claim of threats or open acts of hostility shown against defendant by the people of Orange County (*People* v. *Yoakum*, 53 Cal. 566; *People* v. *Suesser*, 132 Cal. 631 [64 P. 1095]; *People* v. *McKay*, 37 Cal.2d 792 [236 P.2d 145]). The first trial commenced over six weeks after the indictment was returned and four weeks after defendant entered his pleas, and the second trial commenced over 11 weeks after the indictment was returned,

during which periods of time, according to the counter-affidavits, any public feeling of indignation had largely subsided and reached a normal level. (*People* v. *Yeager,* 194 Cal. 452, 483 [229 P. 40]; *People* v. *Brite,* 9 Cal.2d 666, 689-690 [72 P.2d 122].) Counsel for defendant made thorough and searching inquiry into the state of mind of the prospective jurors on *voir dire* examination at the second trial, and no special difficulty was encountered in securing a jury. ▪ Although a juror may have read newspaper articles of the crime and surrounding circumstances, that fact does not render him disqualified where he swears that he can act impartially on the evidence presented. (*People* v. *Yuen,* 32 Cal.App.2d 151, 157 [89 P.2d 438].) The trial judge ordinarily is a resident of the county in which the venue lies, and his familiarity with conditions prevailing there enables him to pass more understandingly on a motion for change of venue than an appellate court. (*People* v. *Hall,* 220 Cal. 166, 170 [30 P.2d 23].) ▪ Under all the circumstances, it does not appear here that the trial court abused its discretion in denying defendant's motion for a change of venue. (*People* v. *Cullen, supra,* 37 Cal.2d 614, 628.)

▪ Defendant next contends that the statutory procedure providing for the determination of a "sexual psychopath" (Welf. & Inst. Code, div. 6, pt. 1, ch. 4) is unconstitutional in circumscribing the right to a jury trial. Section 5501 of the Welfare & Institutions Code sets forth the requirements for invoking the law relative to sexual psychopaths. The pertinent portions of the section, as amended in 1950, read as follows: "(a) When a person is *convicted of a criminal offense,* the trial judge, on his own motion, or on motion of the prosecuting attorney, or on application by affidavit by or on behalf of the defendant, if it appears to the satisfaction of the court that there is probable cause for believing such person is a sexual psychopath within the meaning of this chapter, *may adjourn the proceeding or suspend the sentence,* as the case may be, and *may certify* the person for hearing and examination by the superior court of the county to determine whether the person is a sexual psychopath within the meaning of this chapter.

"(c) When a person is *convicted* of a *sex offense* involving a child under 14 years of age and it is a felony, the court *shall adjourn the proceeding or suspend the sentence,* as the case may be, and *shall certify* the person for hearing and examination by the superior court of the county to deter-

mine whether the person is a sexual psychopath within the meaning of this chapter." (Emphasis added.)

Defendant argues that if trial on the murder charge had been had before a court sitting without a jury, the court would have had to adjourn the proceeding after a finding of guilt until his status as a sexual psychopath had been determined. (*People* v. *Barnett*, 27 Cal.2d 649, 657 [166 P.2d 4].) The court would then have assessed punishment in light of the information made available to it by the medical profession. But by seeking trial before a jury, defendant claims that he was prevented from raising the issue of sexual psychopathy, and it was not considered in determining the verdict and the punishment which resulted therefrom. Defendant argues therefore that his choice of trial before a jury subjected him to a more stringent penalty, and that the statutory procedure is therefore unconstitutional.

This argument is based on the erroneous assumption, which finds no support in the cited case, that sexual psychopathy is a mitigating circumstance. The sexual psychopath law was passed by the Legislature because experience had shown that persons who came within the classification of sexual psychopaths were unable to benefit from ordinary penal confinement and were in need of medical treatment. (*People* v. *Hector*, 104 Cal.App.2d 392, 394 [231 P.2d 916].) The Legislature therefore gave the courts power to commit a person determined to be a sexual psychopath to a medical facility for an indeterminate period of time until the person had been cured or was unable to benefit from further treatment. (Welf. & Inst. Code, § 5512, 5517.) After a cure, or after it had been determined that further treatment was of no benefit, the courts were given the power to resume the proceeding in the criminal matter. (Welf. & Inst. Code, §§ 5517, 5518.) If treatment was determined to be of no further benefit and the patient still was considered dangerous to society, the courts were given power to order the recommitment of the person to an appropriate medical facility for an indeterminate period. (Welf. & Inst. Code, § 5518.)

It should be noted that the above procedure is applicable regardless of the nature of the crime of which defendant has been convicted. (Welf. & Inst. Code, § 5501(a).) Thus a person convicted of a felony or misdemeanor, unconnected in any manner with sexual deviations, may be committed as a sexual psychopath if the evidence so justi-

fies. ■ It is obvious therefore that the primary purpose of the Legislature was to protect society against the activities of sexual psychopaths (*People* v. *Hector, supra,* 104 Cal.App.2d 392, 394), and that it was not intended to make sexual psychopathy a mitigating circumstance. ■ On the contrary, the sexual psychopath may be removed from society under the Sexual Psychopath Law until he is cured or until he is no longer considered a menace to the safety of others. The court may thereafter resume the criminal proceeding and impose the punishment allowed by law since the confinement as a sexual psychopath is not a substitute for punishment, the entire statutory procedure being civil in nature rather than penal. (*In re Keddy,* 105 Cal.App.2d 215, 216, 217 [233 P.2d 159] ; ''Sane Laws for Sexual Psychopaths,'' 1 Stan.L.Rev. 486, 492.)

■ Section 5501 of the Welfare and Institutions Code provides that in a proper case the trial judge may adjourn the proceedings or suspend the sentence. The Legislature thus has given the court an alternative which it may choose within its discretion. Since sexual psychopathy is not a mitigating circumstance, the court may in its discretion proceed to impose sentence before taking up the issue of sexual psychopathy. Defendant would, consequently, be in no different position after a trial by a court sitting without a jury than after trial by jury, for in neither case would he be entitled, as a matter of right, to have his status as a sexual psychopath determined prior to sentence. We therefore conclude that there is no merit in defendant's claim that the sexual psychopath law circumscribes his right to a jury trial. ■ Furthermore, we are of the opinion that the question of sexual psychopathy becomes wholly immaterial after the imposition of sentence involving the death penalty. The nature of the sentence in such case assures the protection of society from any future activities of the defendant, regardless of whether or not he may be a sexual psychopath.

Defendant also contends that his trial proceeded in such an atmosphere of bias that he was ·denied a fair trial. He complains particularly of certain acts by the court and the district attorney.

Defendant's trial was a prolonged, hard fought proceeding. It was surrounded by the intense public interest which so often is present in notorious criminal cases. As a result counsel for both sides and the court were under tension, and

this tension at times found expression between the court and defense counsel. It culminated in one of defendant's counsel being convicted of contempt of court and sentenced to the county jail. Upon certiorari, the order adjudging guilt and imposing sentence was annulled. (*Chula* v. *Superior Court,* 109 Cal.App.2d 24 [240 P.2d 398].)

The proceeding resulting in the citation for contempt occurred in the course of defendant's sanity hearing. The alleged contemptuous acts relate to the attorney's procedure in attempting to elicit certain medical testimony from one of the court-appointed psychiatrists bearing on the theory of defendant's case. The citation for contempt was made outside the presence of the jury, and the contempt proceedings were instituted by the trial judge after the jury had returned its verdict on the insanity issue and also after the court's imposition of the death penalty on defendant. In reviewing the propriety of the contempt sentence, the appellate court in a detailed opinion, noted the prolonged trial periods which had been necessary in determination of the case, the record's failure to show any act by defendant's attorney in wilful disobedience of the court's ruling, and the apparent feeling of responsibility on the part of defendant's attorney to fully protect his client's interests in pursuing his examination of the medical experts. Accordingly, the appellate court concluded that the record did not show that defendant's attorney was guilty of acting "wilfully," "deliberately," and "with complete disregard and in flagrant violation of" the admonitions of the trial court.

We have closely examined the record to determine whether any actions by the court indicated bias against the defendant. Rather than finding bias we find that the court here made every effort to see that defendant received a fair and impartial trial, unprejudiced by any improper comments or conduct. All discussions between the court and counsel were held out of the presence of the jury. Mostly they were held in chambers. In the few instances that defendant's counsel requested the court to give an admonitory instruction because the jury might have been influenced by the tone or wording of the court's comments, the court immediately gave such instruction. If any bias did appear during the trial, and we cannot say from the record that it did, it was certainly cured by the instructions of the court.

The conduct of the district attorney was, however, not as faultless. During the closing argument by Mr. Davis, the district attorney, the following took place:

Mr. Davis: . . . And counsel says, and I am only quoting him, he says, 'I had an awful time pulling out of the Defendant—,' that is the words he used, '—pulling out of the Defendant this story he told.' I submit to you the appropriate language counsel should have said, 'I had an awful time pushing that story into his——.'

"Mr. Chula: Your honor, I object to that as being prejudicial and absolutely a lie.

"Mr. Davis: That is exactly what the facts are.

"Mr. Chula: If Your Honor please, the facts will bear me out nobody could tell it like that that would——

"The Court: The jury will be instructed to disregard the statement of both counsel.

"Mr. Chula: I wish to cite the prosecution's action as misconduct and request a mistrial at this time.

"The Court: Motion denied.

"Mr. Davis: I will leave it to you jurors now. May I discuss this in any way, Judge? This defense, and I have had a good many years of experience, men, and you too, ladies, handling cases such as this, and I submit in all fairness to everybody that this is a planned defense and it didn't grow out of the mind of this Defendant.

"Mr. Chula: If Your Honor please, I wish to further cite this prosecutor's statement as misconduct in the face of the attitude of the Court and the ruling of the Court to disregard those statements. The prosecutor knows full well what he is doing.

"Mr. Davis: Sure, I do.

"Mr. Chula: That he is making those statements that are unfair and not a fair deduction from the evidence that we have before us.

"The Court: The jury will be instructed to disregard all conversation of counsel." And shortly thereafter:

"Mr. Davis: . . . Jurors, that's not true—most damnable thing that I believe I ever heard stated in a courtroom—a little ten-year-old girl, gone to her God, not a smear or blemish on her except what this defendant said. *What some people won't do for a fee.* (Italics added.)

"Mr. Chula: If Your Honor please, I would like to object to that last statement and ask that—I cite it as prejudicial misconduct on behalf of the District Attorney, and the jury

should be ordered to disregard it. I request a mistrial on that statement.

"THE COURT: The jury will be instructed to disregard the last statement; the motion for a mistrial will be denied. Go ahead, Mr. Davis."

Such conduct on the part of the district attorney was highly improper (*People* v. *Charlie,* 34 Cal.App. 411, 415 [167 P. 703]), and could not have been intended to serve any legitimate purpose. The admonition given by this court in *People* v. *Lee Chuck,* 78 Cal. 317, 329 [20 P. 719], might well be remembered by the prosecuting officer: "They [prosecuting officers] seem to forget that it is their sworn duty to see that the defendant has a fair and impartial trial, and that he be not convicted except by competent and legitimate evidence. Equally with the court, the district attorney, as the representative of law and justice, should be fair and impartial. He should remember that it is not his sole duty to convict, and that to use his official position to obtain a verdict by illegitimate and unfair means is to bring his office and courts into distrust. We make due allowance for the zeal which is the natural result of such a legal battle as this, and for the desire of every lawyer to win his case, but these should be overcome by the conscientious desire of a sworn officer of the court to do his duty, and not go beyond it."

While the misconduct of the district attorney was serious, we cannot, in the face of the overwhelming evidence of defendant's guilt, come to the conclusion that it was so prejudicial as to have caused a miscarriage of justice. (Cal. Const., art. VI, § 4½.) The prompt objections of defense counsel, and the admonitions of the court corrected any prejudice which flowed from these remarks. (See *People* v. *Charlie, supra,* 34 Cal.App. 411, 415.)

Defendant makes a number of other contentions but fails to support them with argument. Nevertheless, because of the nature of this case, we have examined them closely. We find them, however, to be without merit.

Complaint is made of the trial court's failure to give a precautionary instruction as required in cases involving Penal Code, section 288. The charge against defendant was murder (Pen. Code, § 189) and not a violation of Penal Code, section 288. Sexual offenses are difficult to disprove, and a cautionary instruction is therefore required where the victim is the prosecuting witness. (*People* v. *Putnam,* 20 Cal.2d 885 [129 P.2d 367]; *People* v. *Lucas,* 16 Cal.2d 178 [105

P.2d 102, 130 A.L.R. 1485].) However, in the case of murder the reasons listed in *People* v. *Benson,* 6 Cal. 221, 223 [65 Am.Dec. 506], are inapplicable since the victim is dead and physical evidence is usually present. The trial court therefore did not err in refusing to give the precautionary instruction.

■ Defendant also complains of the trial court's refusal to permit the defendant to be subjected to the "truth drugs" while on the witness stand. It is questionable whether the results of such examination would have been admissible in evidence. (*People* v. *Cullen,* 37 Cal.2d 614, 626 [234 P.2d 1].) But even if they were admissible, the procedure would be discretionary with the trial court, and it cannot be said that the court abused its discretion.

■ The trial court also refused to appoint independent experts. This was a matter within the court's discretion (Code Civ. Proc., § 1871), and no abuse thereof appears from the record.

■ At the beginning and the conclusion of the first trial, defendant's counsel made a motion to withdraw from the case. The motion was denied in each instance. Defendant claims that he was prejudiced thereby because he had no money with which to hire experts, while the public defender, who would have been substituted if defendant's counsel had been allowed to withdraw, could, because of the resources of his office, have hired independent experts.

Defendant's counsel was appointed by the court to represent defendant. The court could in its discretion refuse him permission to withdraw, having in mind whether such withdrawal might work an injustice in the handling of the case. (See *Linn* v. *Superior Court,* 79 Cal.App. 721, 723 [250 P. 880].) Here no abuse of discretion appears.

■ The court appointed the local constable as elisor to summon the special venire for the second trial. Defendant claims that he was biased, citing an instance where the elisor, on *voir dire* examination, indicated that he would not select uneducated people as jurors. This does not appear to indicate bias. The fact that no particular difficulty was encountered in selecting the jury for the second trial would indicate that the elisor performed his duty in a fair, unbiased manner.

The record discloses that defendant had a fair trial, free from any error which would warrant a reversal.

The judgment and the order denying the motion for a new trial are affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., and Schauer, J., concurred.

EDMONDS, J.—I cannot join in the holding that "the question of sexual psychopathy becomes wholly immaterial after the imposition of sentence involving the death penalty." The Welfare and Institutions Code (§§ 5500 et seq.) makes no distinction between conviction of a criminal offense for which the penalty is death and conviction for any other crime. Although it may seem anomalous to include one under sentence of death in legislation giving persons convicted of crime the benefit of medical treatment intended to cure them of criminal propensities, the code sections so provide. The statutory language is plain and admits of no construction.

At the time of the homicide, section 5501(a) (as amended by Stats. 1st Ex. Sess. 1950, ch. 7, § 1) provided, "When a person is convicted of a criminal offense, the trial judge, on his own motion, or on motion of the prosecuting attorney, or on application by affidavit by or on behalf of the defendant, if it appears to the satisfaction of the court that there is probable cause for believing such person is a sexual psychopath within the meaning of this chapter, may adjourn the proceeding or suspend the sentence, as the case may be, and may certify the person for hearing and examination by the superior court of the county to determine whether the person is a sexual psychopath within the meaning of this chapter." While the trial was in progress, and prior to rendition of the verdict, the 1951 amendment to section 5501(a) (Stats. 1951, ch. 1759, § 1) became effective. Its first sentence, even more explicit than the prior statute, reads: "When a person is convicted of *any* criminal offense, *whether or not a sex offense* . . ." (Emphasis added.)

If there had been any question as to the criminal offenses included within the operation of the statute prior to the 1951 amendment (*Cf. People* v. *Haley,* 46 Cal.App.2d 618, 623 [116 P.2d 498]), the Legislature, by that enactment, made it crystal clear that the procedure provided is applicable upon conviction of "any criminal offense, whether or not a sex offense." By the present decision, this court has recognized the broad scope of the code section but holds,

nevertheless, that "any criminal offense" does not include one for which the death sentence has been pronounced.

During the trial, and prior to conviction of any offense, McCracken moved for leave to file a "sexual psychopathic petition." The district attorney objected to the filing of such a petition at that time and his objection was sustained. This ruling was correct because the benefits of the statute are available only when one has been convicted. The following day, McCracken's counsel filed an "Affidavit under Section 5501" wherein he averred that McCracken "has a psychopathic personality, and shows marked departures from normal mentality . . . in a degree constituting him a menace to the health and safety of others." He further stated that two doctors would testify that McCracken "is a sex psychopath." The affiant expressed his belief that McCracken "should be handled in the manner as set out in the Welfare Code in cases of this type."

The code does not specify when the affidavit provided by section 5501 should be filed. The only restriction is that a hearing upon the question of the defendant's psychopathic status may not be had prior to conviction. For this reason, the second motion for an order for examination also was properly denied.

McCracken renewed his application for a hearing in compliance with the statute at the close of his trial upon the plea of not guilty by reason of insanity and subsequent to the rendition of the verdict of guilty. The court, without explanation of its ruling, denied the "motion to adjourn or suspend proceedings under Section 5501 of the Welfare & Institutions Code."

Had the affidavit of McCracken's counsel constituted the only evidence upon the question whether McCracken is a sexual psychopath, the ruling of the court clearly would have been within its discretion. Nothing in the affidavit indicates any more than a belief upon the part of counsel that McCracken is a sexual psychopath, a belief which the trial judge, from his own observations, might not have shared. (*People* v. *Smith,* 100 Cal.App.2d 162, 165 [223 P.2d 82].) The court has a sound discretion to determine from the affidavits filed and the evidence adduced whether the defendant is a sexual psychopath. (*People* v. *Haley, supra,* p. 622.) This is clear from the provision of section 5501(a) that a hearing may be ordered "if it appears to the satisfaction of the court that there is probable cause for believing such

person is a sexual psychopath.'' ''The court is not ousted of jurisdiction over the criminal proceeding by the mere filing of an affidavit asserting that the accused is a sexual psychopath. It is not mandatory that the court shall adjourn the criminal proceeding when the affidavit is filed. The word 'may,' as it is used in that section should not be construed as a mandatory direction to the court regardless of the sufficiency of the showing. It is merely discretionary. Unless there is an abuse of that discretion the ruling of the court in that regard may not be disturbed on appeal.'' (*People* v. *Haley, supra.*)

However, in addition to the affidavit of counsel, the court had before it uncontradicted evidence by qualified experts that McCracken is a sexual psychopath. This evidence was presented in the written reports of psychiatrists appointed by the trial judge to examine McCracken and their testimony at his trial upon the issue of not guilty by reason of insanity. He was characterized by them as a sexual psychopath, and one of them added that he is such a person within the meaning of section 5500 of the Welfare and Institutions Code. Under these circumstances, the denial of a hearing to determine whether McCracken is a sexual psychopath as defined by statute was an abuse of discretion. (*People* v. *Barnett,* 27 Cal.2d 649, 656 [166 P.2d 4].)

This is not to say that the trial court was required to find that McCracken is a sexual psychopath and order that he be dealt with accordingly. Had there been a hearing upon the question of his mental status in that regard, the evidence might have justified a determination that McCracken is not one entitled to the benefits of the sexual psychopath law. But I find no basis, either in the language of the statute, nor the evidence which was before the trial court when the motion for a hearing was denied, to justify that ruling.

Since the decision in *People* v. *Barnett, supra,* the statute has been amended to increase materially the duty of the trial judge. At that time, section 5501 provided that the court might follow the statutory procedure if ''it appears by affidavit to the satisfaction of the court that such person is a sexual psychopath.'' Thus, if the affidavit were insufficient to satisfy the court it could deny a hearing at its discretion. (*People* v. *Smith, supra*; *People* v. *Haley, supra.*) However, in 1950 the section was amended to permit the trial judge to order a hearing ''on his own motion, or on

motion of the prosecuting attorney, or on application by affidavit by or on behalf of the defendant, if it appears to the satisfaction of the court that there is probable cause for believing such person is a sexual psychopath.'' (Stats. 1st Ex. Sess. 1950, ch. 7, § 1.) The probable cause may now arise not only from the affidavit, but from the observations of the trial judge or the showing made upon a motion by the prosecuting attorney.

For these reasons, I would reverse the judgment of conviction insofar as it orders McCracken to be delivered into the custody of the warden at San Quentin for execution of the death penalty; otherwise it should be affirmed. I would also affirm the order denying McCracken's motion for a new trial but remand the cause to the trial court with directions to suspend the sentence for the purpose of hearing and determining whether or not McCracken is a sexual psychopath and after such hearing to take appropriate proceedings in the matter as specified in sections 5500 through 5518 of the Welfare and Institutions Code.

Appellant's petition for a rehearing was denied August 21, 1952. Edmonds, J., was of the opinion that the petition should be granted.