[Crim. No. 20837. Sept. 5, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANK EDWARD SAFFELL, Defendant and Appellant.

**COUNSEL**

Appellate Defenders, Inc., under appointment by the Court of Appeal, and Handy Horiye for Defendant and Appellant.

Evelle J. Younger and George Deukmejian, Attorneys General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Alan S. Meth and Henry R. Mann, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**RICHARDSON, J.**—We consider and will reject the contention that the Mentally Disordered Sex Offenders Act (the Act) (Welf. & Inst. Code, § 6300 et seq.; all further statutory references are to that code unless

otherwise cited) constitutes a denial of equal protection of the laws. The specific target of constitutional attack is that provision of the Act which automatically commits for a period of treatment equal to the upper term for the underlying criminal offense (§ 6316.1) those individuals found to be mentally disordered sex offenders (MDSOs) who are amenable to such treatment and precludes any credit for good behavior in the manner described by Penal Code section 2930 et seq. (*ibid.*).

The identification and processing of MDSOs are carefully prescribed by statute. Section 6300 defines an MDSO as one "who by reason of mental defect, disease, or disorder, is predisposed to the commission of sexual offenses to such a degree that he is dangerous to the health and safety of others." When a person is convicted of any offense for which registration as a sexual offender is required by section 290 of the Penal Code or "any felony or misdemeanor which is shown by clear proof or the stipulation of the defendant to have been committed primarily for purposes of sexual arousal or gratification" (§ 6302, subd. (a)), the trial court may certify the person for a hearing and examination by the superior court if it is satisfied that there is probable cause to believe such person is an MDSO (*ibid.*).

The alleged MDSO must then appear before the superior court where he must be "inform[ed] . . . that he is certified or alleged to be a mentally disordered sex offender, and inform[ed] . . . of his rights to make a reply and to produce witnesses in relation thereto." (§ 6305.)

The person alleged to be an MDSO must be present at the commitment hearing and "if he has no attorney, the judge shall appoint the public defender or other counsel to represent him. . . ." (§ 6314.) If, after the hearing, which must include the consideration of the reports and testimony of two or three psychologists or psychiatrists who have personally examined the subject (§§ 6307, 6308), "the court finds that the person is a mentally disordered sex offender and that the person *could* benefit by treatment in a state hospital, or other mental health facility the court in its discretion has the alternative to return the person to the criminal court for further disposition, or may make an order committing the person to the department for placement in a state hospital, or may commit the person to the county mental health director for placement in an appropriate public or private mental health facility, . . . No person shall be admitted to a state hospital or other facility without having been evaluated by the county mental health director or his or her designee.

"If after examination and hearing, the court finds that the person is a mentally disordered sex offender but will *not* benefit by care or treatment in a state hospital or other facility the court shall then cause the person to be returned to the court in which the criminal charge was tried to await further action with reference to such criminal charge. Such court shall resume the proceedings and shall impose sentence or make such other suitable disposition of the case as the court deems necessary." (§ 6316, italics added.)

In the case of a person found to be an MDSO amenable to treatment "the court shall state in the commitment order the maximum term of commitment, . . . [which] shall mean the longest term of imprisonment which could have been imposed for the offense or offenses of which the defendant was convicted, including the upper term of the base offense and any additional terms for enhancements and consecutive sentences which could have been imposed less any applicable credits as defined by Section 2900.5 of the Penal Code and disregarding any credits which could have been earned under Section 2930 to 2932, inclusive, of the Penal Code." (§ 6316.1, subd. (a).)

In order to commit a person beyond the "maximum term of commitment" prescribed in section 6316.1 the court must conduct a new hearing at which the patient has the right to be represented by an attorney and tried by a jury. At the hearing it must be proved that the person still "Suffers from a mental disease, defect, or disorder, and as a result of such mental disease, defect, or disorder, is predisposed to the commission of sexual offenses to such a degree that he presents a serious threat of substantial harm to the health and safety of others." (§ 6316.2, subd. (a)(2).) Recommitment is for a period of one year. (*Id.,* subd. (b).)

On February 23, 1978, defendant, having waived a jury and following court trial, was convicted of forcible rape (Pen. Code, § 261) and forcible sexual perversion (*id.,* § 288a, subd. (c)), both offenses aggravated with the use of a dangerous weapon, a knife (*id.,* § 12022, subd. (b)).

On March 23, 1978, at the sentencing hearing, the court stated that it had probable cause to believe that defendant was an MDSO within the meaning of section 6300. The court thereupon adjourned the criminal proceeding and certified defendant to the psychiatric department of the superior court for hearing and examination pursuant to section 6302 to determine whether he was an MDSO. Two psychiatrists were appointed pursuant to section 6307 to make a personal examination of defendant.

On April 5, 1978, a judge of the psychiatric department of the San Diego Superior Court considered the separate written reports of the two psychiatrists appointed, heard the testimony of one of the psychiatrists, and found that defendant was an MDSO who *could* benefit by treatment in a state hospital. Defendant was thereupon committed for six years to Patton State Hospital under the provisions of section 6316.1. Pursuant to section 6317 the court requested that the superintendent of the hospital report to the court every six months as to defendant's progress toward recovery.

On April 7, 1978, defendant filed his notice of appeal from his conviction and his commitment to state hospital. Defendant argues that following conviction had he been sentenced as a criminal rather than committed as an MDSO amenable to treatment he would have been eligible to be confined for the middle or lower term for the base criminal offense and could, additionally, receive "good time" credits which would, in combination, make his earliest possible determinate sentencing release date August 1981. He contends that the exclusion of these sentencing possibilities constitutes a denial of equal protection of the law. Under his MDSO commitment for the "maximum term of commitment" defendant has a tentative release date in April 1984. The issues of the automatic imposition of the upper term and the allowance of credits for good behavior are severable and we will examine each in turn.

We note, initially, that the most basic personal liberty interest is involved. While the degrees of restraint for an MDSO may vary considerably, from confinement in state hospital (§ 6316) to outpatient care (§ 6325.1), there is in any case a very considerable limitation on that freedom of action enjoyed by all other citizens. As we unanimously concluded in *People* v. *Olivas* (1976) 17 Cal.3d 236 [131 Cal.Rptr. 55, 551 P.2d 375], "personal liberty is a fundamental interest, second only to life itself, as an interest protected under both the California and United States Constitutions." (P. 251.)

We coupled that expression in *Olivas* with the holding that "once it is determined that [a] classification scheme affects a fundamental interest or right the burden shifts; thereafter *the state* must first establish that it has a *compelling* interest which justifies the law and then demonstrate that the distinctions drawn by the law are *necessary* to further that purpose." (*Ibid.*, italics in original; *In re Moye* (1978) 22 Cal.3d 457, 465 [149 Cal.Rptr. 491, 584 P.2d 1097]; *People* v. *Feagley* (1975) 14 Cal.3d 338, 355 [121 Cal.Rptr. 509, 535 P.2d 373]; *Serrano* v. *Priest* (1971) 5 Cal.3d 584,

597 [96 Cal.Rptr. 601, 487 P.2d 1241].) Such a compelling interest here exists and the statutory design challenged is necessary to serve that interest.

■ While judicial attention to the MDSO is invoked by his commission of a criminal act, the entire statutory scheme providing for the diversion of MDSOs from the mainstream of the criminal justice system clearly indicates that "in MDSO cases, subsequent confinement of the . . . person is for purposes of *treatment,* not punishment." (*In re Moye, supra,* 22 Cal.3d 457 at p. 466, italics in original; see also *In re Bevill* (1968) 68 Cal.2d 854, 858 [69 Cal.Rptr. 599, 442 P.2d 679] [confinement is not for the criminal offense but because of status as an MDSO]; *People* v. *Rancier* (1966) 240 Cal.App.2d 579, 585 [49 Cal.Rptr. 876] [same]; *People* v. *Schaletzke* (1966) 239 Cal.App.2d 881, 887 [49 Cal.Rptr. 275] [MDSO commitment not a substitute for punishment].)

The Act contemplates that the only MDSOs who may be confined for the "maximum term of confinement" are those who the court finds "could *benefit by treatment* in a state hospital, or other mental health facility. . . ." (§ 6316, italics added.) The individual who is determined to be an MDSO but who is *not* amenable to treatment is to be returned to the criminal court for disposition of the charges against him. This is another strong indication that commitment as an MDSO is primarily for treatment.

One commentator has expressed the belief that "As an alternative to prison, the statutes [providing for MDSO commitments] are potentially a positive, far reaching and humanitarian approach to penal reform." (Paddison, *Evolution of a Procedural Hybrid: The Sexual Sociopath Statutes and Judicial Response* (1976) 13 Cal. Western L.Rev. 90, 124.) The treatment aspect of the confinement has been legislatively acknowledged in section 6250 which expressly provides that "as far as possible and consistent with the rights of persons subject to commitment, such persons [including MDSOs] shall be treated, not as criminals, but as sick persons." In *People* v. *Feagley, supra,* 14 Cal.3d 338, 359, we recognized a similar purpose and function: " 'The sexual psychopath law was passed by the Legislature because experience had shown that persons who came within the classification of sexual psychopaths were unable to benefit from ordinary penal confinement and were in need of medical treatment.' (*People* v. *McCracken* (1952) 39 Cal.2d 336, 345 [246 P.2d 913].) Not only is medical treatment the *raison d'etre* of the mentally disordered sex offender law, it is its sole constitutional justification. It is settled that 'A

person committed as a mentally disordered sex offender is not confined for the criminal offense but because of his *status* as a mentally disordered sex offender.' . . . (*In re Bevill* (1968) *supra,* 68 Cal.2d 854, 858.)."

The foregoing thesis was echoed very recently by an appellate court which noted, "Implicit in the decision to commit to state prison rather than as an MDSO is a finding that that defendant does not need the specialized psychiatric treatment involved in the MDSO process but that society will be amply protected by the statutory prison term, whereas the MDSOs are committed because they have been found to need the specialized process." (*People* v. *Superior Court (Rigg)* (1978) 80 Cal.App.3d 407, 414 [145 Cal.Rptr. 711].)

Further confirmation that MDSO confinement is for treatment purposes only may be found in those amendments to the Act which reduce the maximum period of the initial commitment from life to the longest possible term under the determinate sentencing law for the crime or crimes committed.

Both the wording and application of the Act, taken in conjunction with prior expressions by this and other courts, lead us to conclude that the state does have a compelling interest in identifying and providing medical attention to those individuals amenable to treatment who commit sexually motivated criminal acts. Were we to ignore the possibility of the diagnosis, treatment, and cure of those mental disorders which produce criminal acts, thereby limiting the state's response to punitive measures alone, we would be, perhaps, rejecting one of penology's most significant advances.

█ We are unable to accept defendant's contention that the automatic imposition on the MDSO of the upper term for the underlying criminal offense is unnecessary to further this compelling state purpose.

The confinement term of a prisoner and the commitment period of an MDSO are essentially different in nature. The purpose of incarcerating a prisoner is punishment. (Pen. Code, § 1170, subd. (a)(1).) He must serve his entire term less good time (*id.,* § 3000, subd. (a)) and is released subject only to parole. (*Ibid.*) In contrast, the commitment of an MDSO offender, designed primarily for treatment, results from a proceeding separate from the criminal action. As the United States Supreme Court noted in its review of a similar statutory scheme, the Colorado Sex Offenders Act, "The Sex Offenders Act does not make the commission of

a specified crime the basis for sentencing. It makes one conviction the basis for commencing another proceeding under another Act to determine whether a person constitutes a threat of bodily harm to the public, or is an habitual offender and mentally ill. That is a new finding of fact [citation omitted] that was not an ingredient of the offense charged." (*Specht* v. *Patterson* (1967) 386 U.S. 605, 608 [18 L.Ed.2d 326, 329, 87 S.Ct. 1209].)

The MDSO may still, by operation of law, be committed indefinitely. The initial commitment merely sets the date at which the state must release the MDSO or make a showing that the individual still "presents a serious threat of substantial harm to the health and safety of others." (§ 6316.2, subd. (a)(2).) Before the maximum commitment date is reached, however, the individual may be returned to the criminal court if he will not benefit by further care and treatment and is not dangerous or if he has not recovered and still is a danger to the health and safety of others. (§ 6325.) His status as an MDSO must be reviewed by the committing court every six months and he is also eligible for commitment in a local mental health facility or for outpatient treatment. (§§ 6327, 6325.1.)

One recent evaluation of the MDSO program concluded that "Several traditional concerns regarding sex offender programs were proven unfounded by this examination of the California program. On the whole, the availability of the program appeared to ameliorate the harshness of criminal conviction upon a large number of sex offenders. Offenders committed to the program tended to spend significantly less time institutionalized than did similar offenders sentenced to imprisonment. This suggests that many sex offenders spent less time institutionalized under less oppressive circumstances than would have been the case had the program not been in existence, although some offenders may have been committed to the program and thus institutionalized who, in the absence of the program, would not have been sentenced to imprisonment and thus would have escaped institutionalization entirely. [Fn. omitted.] Moreover, the program was seldom used to process nuisance offenders, and therefore did not serve to materially disadvantage such persons." (Dix. *Differential Processing of Abnormal Sex Offenders: Utilization of California's Mentally Disordered Sex Offender Program* (1976) 67 J.Crim.L. & C. 233, 242.)

The MDSO legislative scheme permits maximum flexibility (e.g., return to court for criminal sentencing, continued treatment, outpatient

treatment, etc.) within an extended period of time so that hospital officials need not return to the courts repeatedly for extensions of confinement. It will be seen, for example, in the present case that by operation of section 6316.1, defendant's maximum term of commitment is six years. Without "good time" credits, the release date would be in April 1984, unless there were further proceedings pursuant to section 6316.2. However, if defendant had not received the upper term and, allowing "good time" credits, his determinate sentencing law release date would be in August 1981. If further treatment was needed, however, to confine defendant until April 1984, the People would have to follow the extended commitment procedures described in section 6316.2, thus requiring jury trials in 1981, 1982, and 1983. Yet the statutory structure prevents the warehousing of MDSOs with minimal or no treatment by requiring their release (or a showing by the state why they should not be released) at some fixed date.

Our recent opinion in *In re Moye, supra,* 22 Cal.3d 457, is fully consistent with the present reasoning. In *Moye,* we held "that principles of equal protection require . . . that persons committed to a state institution following acquittal of a criminal offense on the ground of their insanity cannot be retained in institutional confinement beyond the maximum term of punishment for the underlying offense of which, but for their insanity, they would have been convicted. To the extent practicable, . . . *calculation of the maximum term of punishment should be made in accordance with the principles expressed in section 6316.1 of the Welfare and Institutions Code* [the Mentally Disordered Sex Offenders Act]." (P. 467.) This language in *Moye* clearly presaged our approval of the statutory scheme establishing the duration of initial MDSO commitments.

Because the initial commitment merely sets the date at which the state must demonstrate that the person remains a danger within the meaning of section 6316.2 or release him from confinement as an MDSO, it follows that the duration of the initial restraint should bear some reasonable relationship to the degree of danger posed by the particular individual. Thus, contrary to defendant's assertion, it is not unreasonable to use the base term for the underlying criminal offense as a reference in setting the original period of commitment. The use of such a referent in no way alters the nature, or affects the purpose, of the MDSO commitment.

We conclude that the present MDSO procedures are justified and that there is a dual compelling state interest in providing effective treatment for those disposed to the commission of this particular category of

criminal acts, while, at the same time, assuring the safety of the public. Further, we conclude that the present method of computing the initial commitment period for one determined to be an MDSO is reasonable and a necessary component of the total statutory scheme.

■ In similar fashion, we are unable to agree with defendant's further contention that he is denied equal protection of the laws because he cannot earn the "good time" credit for good behavior (§ 6316.1, subd. (a)) which is available to inmates of correctional facilities.

Article 2.5 of the Penal Code provides in relevant part:

"§ 2930.(a) The Department of Corrections shall inform every prisoner . . . of all applicable prison rules and regulations including the possibility of receiving a one-third reduction of the sentence for good behavior and participation.

"§ 2931.(a) . . . the Department of Corrections shall have the authority to reduce the term prescribed . . . by one-third for good behavior and participation . . . . .

"(b) Total possible good behavior and participation credit shall result in a four-month reduction for each eight months served in prison or in a reduction based on this ratio for any lesser period of time. Three months of this four-month reduction, or a reduction based on this ratio for any lesser period, shall be based upon forbearance from any or all of the following activities: [¶] (1) Assault with a weapon; or escape. [¶] (2) Physically assaultive behavior; possession of a weapon without permission; possession of controlled substances without prescription; . . . [¶] (3) Intentional destruction of state property . . . ; falsification of a significant record or document; possession of escape tools without permission; . . .

"(c) One of the four months reduction, or a formula based on this ratio for a lesser period, shall be based solely upon participation in work, educational, vocational, therapeutic or other prison activities."

The purposes of the provision for "good time" credits seem self-evident. First, and primarily, prisoners are encouraged to conform to prison regulations and to refrain from engaging in criminal, particularly assaultive, acts while in custody. Second, section 2931, subdivision (c), induces prisoners to make an effort to participate in what may be termed "rehabilitative" activities.

While these twin goals are undoubtedly both appropriate and necessary in a prison setting, for several reasons they are not necessarily suitable within a hospital context.

First, the very concept of "giving" or "taking away" time credits might materially interfere with other principles central to the operation of a therapeutic program. We cannot presume that hospital programs in general, and staff-patient relationships in particular, will benefit from a procedure in which patients are threatened with varying lengths of commitment dependent upon their in-hospital behavior. MDSOs are, by statutory definition, individuals who suffer from a "mental disease, defect, or disorder." The rationale of "good time" credit as a reward for behavioral conformity does not readily fit the company of the mentally disturbed. The "carrot or stick" approach represented by the extension or withdrawal of credit as reward or punishment seems inconsistent with the goals of a hospital treatment facility.

Second, if a patient intentionally acts in a disruptive manner in a hospital setting, he may be determined to be unamenable to treatment and transferred to state prison. This consequence, readily perceived, itself acts as a deterrent to intentional criminal conduct in the hospital setting.

Third, at least part of the "good time" may be earned by participation in prison rehabilitative and educational programs. It is not clear whether state hospitals currently even provide such "work, educational, vocational, [or] therapeutic" activities.

Fourth, denial of "good time" credits (pursuant to Pen. Code, § 2932) involves a whole panoply of administrative requirements, including a hearing. It is questionable whether hospital administrators have either the ability or the time, given an already burdensome workload, to comply with these additional procedures or whether the type of adversary proceeding which might result, contemplating written notice, investigation, hearing, etc., would assist in furthering the treatment program of the patient.

Finally, it seems pointless to give an MDSO "good time" credit against his medical commitment period because section 6316.2 allows extension of the treatment period if found to be necessary. The concept of "good time" credit only has meaning within the context of a fixed criminal sentence which may not be so extended.

For the above reasons, we conclude that the compelling state interest which underlies the effective treatment of MDSOs justifies a legislative determination not to expand the application of "good time" procedures to MDSO commitments.

Defendant's final contention is that the trial court erroneously admitted evidence of his prior prison term which, although struck from the record, was prejudicial because the case was close. This argument is fully answered by noting that defendant's trial was by the court which, under well settled principles, would not have been prejudiced by a charge of a prior felony conviction. (*In re Hernandez* (1966) 64 Cal.2d 850, 851 [51 Cal.Rptr. 915, 415 P.2d 803]; *People* v. *Pierson* (1969) 273 Cal.App.2d 130, 133 [77 Cal.Rptr. 888].)

The judgment of conviction and the order committing defendant as an MDSO are affirmed.

Tobriner, J., Mosk, J., Clark, J., and Manuel, J., concurred.

**NEWMAN, J.**—I dissent because I agree with views that Presiding Justice Gerald Brown articulated as follows when he wrote the opinion for the court of appeal in this case:

"The application of section 6316.1 solely to MDSOs who are amenable to treatment leads to some rather curious results. The MDSO who is not amenable to treatment and who is sentenced under regular court procedures for committing an unaggravated crime will receive the middle rather than the maximum term. Presumably the shorter period of confinement is adequate to protect against the recurrence of his conduct but not sufficient to effect a cure (*People* v. *Feagley, supra,* 14 Cal.3d 338, 376 [121 Cal.Rptr. 509, 535 P.2d 373]). The amenable MDSO who is given the maximum term, is committed and recovers, is then returned to the courts for sentencing or other disposition, presumably could be required to serve the maximum term even though the crime committed was not an aggravated one.

"Is there a compelling state interest which justifies making the initial confinement period for the MDSO who is amenable to treatment longer than the MDSO who is not amenable to treatment or longer than the person who is not an MDSO? The People argue there is a compelling state interest in the protection of society and in the treatment of the

mentally disturbed. However, an MDSO not amenable to treatment is confined for a shorter period and, as noted earlier, is presumed able to function adequately in society at the end of that time; there is no reason to think an MDSO who is amenable to treatment would not make at least the same amount of progress in the same period of time. Since the length of the initial commitment is determined by the crime committed, not by the particular mental disturbance, there is no relationship between the maximum term and successful treatment. It is a violation of equal protection to require those declared as MDSOs amenable to treatment to serve the maximum term of confinement while other persons who commit precisely the same crime are confined only for the middle term.

"Likewise because the length of confinement of an MDSO is predicated on the particular crime committed rather than the mental condition involved, he must also be given the benefit of good time credit.

"The constitutional infirmity of the statute arises because the length of the initial term is based on the crime committed and all persons convicted of the same crime must be given the same term of confinement. This is not to say, however, that the state does not have an interest in protecting society and in treating its mentally disordered citizens and cannot in pursuit of these aims have the length of the term depend on treatment. (See, *People v. Superior Court (Rigg)* 80 Cal.App.3d 407, 414 [145 Cal.Rptr. 711].) This in effect is what now happens since an MDSO after the appropriate due process procedures may have his term extended beyond the initial term (Welf. & Inst. Code, § 6316.2). The determination here that part of the MDSO procedure is unconstitutional will, in practice, make little change as far as the system is concerned. Here assuming there were no aggravating circumstances, Saffell should have been given a five-year rather than a six-year term with the opportunity of reducing the term of his confinement by one-third through good behavior (Pen. Code, §§ 2931, 2932). However, at least every six months the superintendent of the facility must make a report on his progress (Welf. & Inst. Code, § 6317). If he has recovered before the five years has passed he should be returned to the court for sentencing with credit for the time spent committed as an MDSO (Welf. & Inst. Code, § 6325); if at the end of his initial period of confinement he still presents a threat of harm his commitment can be extended. (Welf. & Inst. Code, § 6316.2; see, *In re Moye*, 22 Cal.3d 457, 464 [149 Cal.Rptr. 491, 584 P.2d 1097].) Thus, an MDSO who does not improve can be held as long as it is necessary for

treatment to be effective or for a determination that further treatment is futile."

Bird, C. J., concurred in the views of Presiding Justice Gerald Brown as expressed in the opinion issued by the Court of Appeal and reprinted above.