[Crim. No. 19040. First Dist., Div. One. Mar. 24, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM JOSEPH EVENSON, Defendant and Appellant.

**COUNSEL**

Gabriel M. Gesmer, under appointment by the Court of Appeal, Saul M. Ferster and Levin, Gesmer & Ferster for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Robert R. Granucci and Martin S. Kaye, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**THE COURT.*—**William Joseph Evenson appeals from an order committing him to the State Department of Health for placement at a state hospital as a mentally disordered sex offender (Welf. & Inst. Code, § 6300 et seq.). He contends that because the evidence showed that he was "being treated by prayer in the practice of the religion of [a] well-recognized church" (Welf. & Inst. Code, § 6300.1) the commitment was improper. We affirm.

Appellant pleaded guilty to rape by force (Pen. Code, § 261, subd. 2). According to the probation report appellant threw a large stick at a bicycle on which the victim was riding, causing her to fall, and then dragged her off the road into some bushes, pushed her to the ground, and raped her. He then helped her put her pants back on, told her he was sorry, and left the area. The probation report also reflected that approximately a year before the rape appellant had grabbed a teenaged girl who was walking along a street, had pulled her to the side of the street, but then had fled "because he was scared and he realized what he was doing." Appellant also admitted a few instances of abberrant sexual activity with animals.

According to the probation report, appellant attributed the rape in part to emotional pressures caused by the crib death of his infant daughter six weeks earlier. Shortly after the rape, appellant and his wife joined a Baptist church where they were accepted and helped. Appellant's wife was pregnant at the time the probation report was prepared. She expressed strong support for appellant, as did his employer and several family members and acquaintances. The probation officer concluded, however, that appellant "may be a serious danger to society" and recommended mentally disordered sex offender (MDSO) proceedings.

At the time set for hearing on the probation report the trial court suspended criminal proceedings and commenced proceedings under the Mentally Disordered Sex Offenders Act (Welf. & Inst. Code, § 6300 et seq., hereafter MDSO Act). Two psychiatrists were appointed to examine appellant; at the ensuing hearing each testified that appellant was an MDSO but that in the five months which had elapsed since the rape

*Before Racanelli, P. J., Elkington, J., and Grodin, J.

appellant had made such substantial progress under psychotherapy as to have minimized any immediate danger he might previously have posed to the health and safety of others. Appellant's psychotherapist corroborated these opinions. A Baptist minister testified that appellant and his wife had joined the minister's church and had become involved in group and prayer therapy. A second minister corroborated the Baptist minister's account of the value of prayer therapy and one of the two psychiatrists agreed that appellant's church group and individual counseling were "therapeutic."

Appellant's trial counsel asked the trial court to retain appellant in the community to continue psychotherapy and prayer therapy, but the trial court concluded that he was an MDSO and committed him for placement at a state hospital. The county mental health director, in an evaluation then required by the MDSO Act, concluded, consistent with the trial court's findings, that appellant "is still a potential danger to the health and safety of other persons." Appellant's trial counsel sought to invoke the prayer-treatment exemption stated in Welfare and Institutions Code section 6300.1; the trial court reiterated "my findings that in fact he is dangerous to persons or property, which seems to me would exclude him from the meaning of 6300.1; and I am disposing of the matter on that basis."

Section 6300 provides in pertinent part that "[a]s used in this article, 'mentally disordered sex offender' means any person who by reason of mental defect, disease, or disorder, is predisposed to the commission of sexual offenses to such a degree that he is dangerous to the health and safety of others." Section 6300.1 provides in pertinent part that "[n]o person who is being treated by prayer in the practice of the religion of any well-recognized church...shall be ordered detained or committed under this chapter unless the court shall determine that he is or would likely become dangerous to himself or to the person or property of others...."

In this court appellant concedes that he was an MDSO within the section 6300 definition but renews his contention that under the evidence he was entitled to the section 6300.1 prayer-treatment exemption from a state hospital commitment. He is confronted at the threshold of his argument by the apparently plain statutory admonition that a person dangerous enough to be an MDSO (as he necessarily concedes he was) is by the same token too dangerous to qualify for the prayer-treatment exemption. To cross this threshold appellant:

Acknowledges that on the faces of the sections no MDSO can ever qualify for the prayer-treatment exemption.

Argues that this result would render section 6300.1 a nullity and that the Legislature could not have intended such a result.

Proposes that section 6300.1's reference to "dangerous" be construed (in order to give § 6300.1 meaning and thus to save it from nullity) to mean a degree of menace significantly greater than that connoted by the same word "dangerous" in section 6300. Thus, appellant argues, section 6300.1 must be interpreted "to allow for the noncustodial status of an MDSO whose potential for danger has been diminished, but not entirely erased."

Suggests that section 6300.1 is an affirmative provision for outpatient prayer treatment for such an MDSO.

Contends that the evidence shows that he is such an MDSO, that he is therefore entitled by section 6300.1 (as thus construed) to the prayer-treatment exemption, and that the order of commitment must therefore be reversed.

▆▆ We conclude that this resourceful argument founders upon its assumption that section 6300.1 applies only to the MDSO Act. Our own review of the legislative history of section 6300.1 persuades us that the section applies, as its precursors have applied, to persons other than MDSOs who are subject to institutionalization on the basis of criteria other than danger to persons or property, that the section's exception for "dangerous" persons therefore does not render the section a nullity, and that the section's placement among the provisions of the MDSO Act was an inadvertence which does not affect the validity of the section. ▆▆ It follows that the section need not be reconstrued to preserve it from nullity and that as a conceded MDSO, and thus by definition a "dangerous" person, appellant did not qualify for the prayer-treatment exemption.

▆▆ Far from being a provision affirmatively authorizing prayer as an alternative form of out-patient treatment, section 6300.1 appears to have been in its inception, and to have remained, simply one of several California statutory provisions designed to assure that, except in unusual circumstances, no one who believes in and is undergoing treat-

ment by prayer will be required to accept medical treatment instead. (Cf. Note, *Religious Beliefs and the Criminal Justice System: Some Problems of the Faith Healer* (1975) 8 Loyola L.A. L.Rev. 396, 428-429, fn. 202.) Section 6300.1 can be tracked directly back to a provision added to the code in 1947, stating a prayer-treatment exemption applicable to mentally ill persons generally (Stats. 1947, ch. 919, § 10, p. 2125). In 1965 the initial exemption provision was replaced by a substantially similar provision applicable to a chapter of the code which covered mentally ill persons, mentally deficient persons, epileptics, drug addicts, inebriates, mentally abnormal sex offenders, and juvenile court wards as well as mentally disordered sex offenders: The provision contained an exception for "dangerous" persons identical to that contained in today's section 6300.1, and thus clearly excluded MDSOs (who were defined then as they are now) but probably could have been applied on a case-by-case basis to persons in most if not all of the other categories in the chapter. (Cf. Stats. 1965, ch. 391, § 4, p. 1632.)

In 1967, in the course of the sweeping reformation of California commitment procedures which included enactment of the Lanterman-Petris-Short Act, the antecedent of section 6300.1 was moved into the last paragraph of a long introductory section 6250 of new provisions for judicial commitment in the Welfare and Institutions Code and was made expressly applicable to a chapter which covered drug addicts, mentally abnormal sex offenders, mentally retarded persons, and juvenile court wards as well as MDSOs. (Cf. Stats. 1967, ch. 1667, § 37, p. 4107, operative July 1, 1969.) Again it appears that the exemption, while clearly not applicable to MDSOs, was potentially applicable within other categories covered by the chapter.

In 1969 a technical amendments bill was proposed which would have repealed section 6250. Late amendments to the bill saved the prayer-treatment exemption but renumbered it, inexplicably, as section 6300.1. This renumbering moved the section into article 2 of chapter 2 of the judicial commitments provisions of the code: Article 2 was the MDSO Act, while chapter 2 (of which art. 2 was a part) also still covered drug addicts, mentally abnormal sex offenders, mentally retarded persons, and juvenile court wards. (Cf. Stats. 1969, ch. 722, §§ 49, 49.1, 49.2, p. 1446.) Coverage of drug addicts and mentally abnormal sex offenders was repealed from chapter 2 in 1970 (Stats. 1970, chs. 339, 1502, pp. 734, 2986-2988), but mentally retarded persons, juvenile court wards, and MDSOs are still covered by the chapter.

We conclude that the text of section 6300.1 is intended to apply, and does apply, to those mentally retarded persons and juvenile court wards subject to chapter 2 who are not "dangerous." That the placement of the text within the article relating to MDSOs was an inadvertence is suggested not only by the history recited above but also by the fact that section 6300.1 refers to "this chapter" while section 6300 refers to "this article." We assume that the Legislature will renumber or otherwise clarify the scope of the text now contained in section 6300.1 if and when such clarification is deemed necessary. ▆▆▆ In the interim, we are satisfied that section 6300.1 is valid and means what it says, and that so long as appellant was deemed an MDSO he could not at the same time qualify for the prayer-treatment exemption.

In his brief appellant also contended that Welfare and Institutions Code section 6316.1, as applied to require that his maximum term of commitment be set by reference to the upper term of imprisonment applicable to the underlying offense and to deny good time credits against the maximum term, deprived him of equal protection of the laws. He now correctly concedes that the Supreme Court has resolved these issues against him in *People* v. *Saffell* (1979) 25 Cal.3d 223 [157 Cal.Rptr. 897, 599 P.2d 92], filed after appellant's opening brief was submitted.

The order of commitment is affirmed.

Appellant's petition for a hearing by the Supreme Court was denied May 22, 1980. Newman, J., was of the opinion that the petition should be granted.