[Crim. No. 21843. Nov. 9, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
ROY FRANK AUSTIN, Defendant and Appellant.

In re ROY FRANK AUSTIN on Habeas Corpus.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Richard Lennon, Deputy State Public Defender, for Defendant and Appellant and Petitioner.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Gary R. Hahn, William R. Weisman and Carla M. Singer, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

RICHARDSON, J.—Defendant Roy Frank Austin, an adult, appeals from two orders of commitment to the California Youth Authority (YA), the first arising out of his conviction on a charge of burglary

(§ 459 of the Pen. Code, the source of all further statutory references unless otherwise noted), and the second from the revocation of probation upon which he was placed following his earlier plea of guilty to a charge of receiving stolen property. (§ 496.) Defendant challenges the imposition by the sentencing court of the upper term of three years as his maximum period of confinement under both orders of commitment. He also challenges the court's refusal to give him presentence good time and participation credits (hereinafter conduct credits) pursuant to sections 2930 through 2932.

In a related petition for writ of habeas corpus, defendant also contends that under the principles of equal protection he is entitled to additional conduct credits for time served at YA.

We will conclude that defendant is entitled to reversal and remand for resentencing because the trial court in imposing sentence failed to follow the procedures required by section 1170 and California Rules of Court, rule 453(a). We will further conclude, however, that the trial court did not err in refusing to calculate conduct credits for the period of presentence incarceration and that defendant is not entitled to such credits for time served during his commitment to YA.

On July 2, 1979, following his conviction on a plea of guilty to receiving stolen property (§ 496), defendant was placed on 3 years probation under various terms and conditions including the requirement that he spend 30 days in county jail. Following his release, on October 12, 1979, defendant was charged with burglary. (§ 459.) After pleading guilty to the latter charge, defendant was committed to YA for the maximum term of 3 years and was given presentence custody credit for 102 days actually served in local custody. (§ 2900.5.)

Defendant was also found to have been in violation of probation previously granted in the stolen property case and his probation was revoked. The court then committed defendant to YA for a period not to exceed 3 years, granting presentence custody credit for 132 days. (*Ibid.*) The sentence so imposed was to run concurrently with that imposed for the new conviction.

Defendant, having been granted presentence custody credit, now requests that he be granted *conduct* credits (§§ 2930-2932) for the time spent in presentence custody. In addition, he asserts in his petition for

habeas corpus that he is entitled to conduct credits for the time served at YA under the order of commitment.

## I. *The Maximum Term*

After defendant entered his plea to the burglary charge a probation report was prepared. After reviewing both crimes and defendant's history, and finding substantial circumstances in aggravation and no circumstances in mitigation, the probation officer recommended that probation be denied in the burglary conviction and revoked in the stolen property case. Despite the above findings, the probation officer recommended imposition of the middle term of two years in both cases.

At the sentencing hearing the court announced its intention to send defendant to YA, stating: "The court has read and considered the probation officer's report . . ., which recommends a denial of probation and commitment to the Youth Authority, but, of course, when we sentence or commit him to Youth Authority, we have to impose—we have to state what the maximum term is, and there was no plea bargain for less than the regular commitment time. I am prepared to follow that recommendation." In amplification, thereafter, the court commented, "I am denying probation because of the numerous crimes of this type that the defendant has committed. The defendant is committed to the Youth Authority. The maximum period he could be sentenced for under the law is three years. That doesn't mean he will be in that facility for that long. It just means that we have to state what the maximum could be."

Defendant contends that the trial court in imposing sentence failed to comply with the requirements of California Rules of Court, rules 439 and 453(a), and section 1170. We agree. Rule 453(a), requires that when a court orders YA commitment for a defendant convicted of a crime for which a sentence under section 1170 could be imposed, "the order of commitment shall specify the term of imprisonment to which the defendant would have been sentenced. The term shall be determined as provided by sections 1170 and 1170.1 and these rules, as though a sentence of imprisonment were to be imposed."

Where, as here, the applicable statute specifies three possible terms, section 1170 requires the sentencing court to select the appropriate term and to apply the sentencing rules of the Judicial Council. Subdivision (c) of section 1170 requires that "The court shall state the reasons for its sentence choice on the record at the time of sentencing." Rule

439(b) mandates that the upper term is justified only if facts in aggravation outweigh those in mitigation and the lower term is justified if the reverse is true. In either case, "The facts and reasons for selecting the upper or lower term shall be stated orally on the record, and shall include a concise statement of the ultimate facts which the court deemed to constitute circumstances in aggravation or mitigation justifying the term selected." (Rule 439(c).) Even if the mid-term is selected, the court must state its reasons for selecting imprisonment. (§ 1170, subd. (c); rule 439(d).)

The People point to the trial court's references to defendant's commission of the second crime while on probation for the first, and his commission of "numerous crimes of this type" as sufficient indication that the court fully considered circumstances in mitigation and aggravation as required. They argue that the court should be deemed to have considered all relevant criteria under rule 409, and that the record clearly indicates the judge's intention to impose the maximum term of imprisonment.

Closely scrutinized, however, the comments of the trial court during sentencing appear ambiguous. For example, the court indicated that it intended to follow the probation report recommendation (two-year commitment) but in fact it imposed a three-year commitment. The court also appears to have been under the impression that it was required to state the maximum possible term for which an adult might have been sentenced on the underlying offense, rather than to select among the possible terms to which an adult might be sentenced under sections 1170 and 1170.1. This confusion may have resulted from the differing requirements of Welfare and Institutions Code section 726 under which *juveniles* who have been committed to YA by juvenile court are committed for a period equivalent to the maximum possible confinement period for adults. (See *In re Eric J.* (1979) 25 Cal.3d 522 [159 Cal.Rptr 317, 601 P.2d 549].)

"In order to assess whether judges are imposing like sentences in like situations (Pen. Code, § 1170.4), it is necessary for them to state on the record why a certain sentence has been selected (Pen. Code, §§ 1170, subd. (c), 1170.3; California Rules of Court, rules 443, 425, 433)." (*People* v. *Walker* (1978) 83 Cal.App.3d 619, 622 [148 Cal.Rptr. 66].) It is unclear from the record before us why the court imposed the sentence that it did, and it is also possible to conclude that the court erroneously believed that it was required to impose the maximum possi-

ble term of commitment. Under such circumstances, we cannot be reasonably assured that the trial court in fact exercised its discretion. It may have been under a misapprehension as to its power to sentence defendant to anything other than the maximum term. We do not suggest, however, that it could not, on the record before it, have imposed such maximum term in the fair exercise of its discretion.

However, in view of the applicable sentencing statutes and rules and the ambiguity concerning whether the court understood that it could sentence defendant to less than the maximum aggravated term, the judgments must be reversed and the causes remanded for resentencing.

## II. *Conduct Credits and YA Commitment*

■ Defendant argues that he is entitled to conduct credits, calculated pursuant to sections 2930 through 2932, for the periods of both presentence (*People* v. *Sage* (1980) 26 Cal.3d 498 [165 Cal.Rptr. 280, 611 P.2d 874]) and YA custody. We will conclude that, although an adult sentenced to YA may not be held in YA confinement for a period exceeding the maximum term for which he would have received state prison confinement (*People* v. *Olivas* (1976) 17 Cal.3d 236 [131 Cal. Rptr. 55, 551 P.2d 375]), he is not entitled to have his term reduced by conduct credits computed under sections 2930 through 2932.

Defendant was sentenced to YA under the provisions of section 1731.5 of the Welfare and Institutions Code and California Rules of Court, rule 453(a). Section 1731.5 permits YA commitment of any person convicted in an adult court of a crime who is under 21 years at the time of apprehension and who is neither sentenced as provided in subdivision (b) of section 1731.5 nor granted probation. Rule 453(a) requires the sentencing court to specify the particular term to which the individual would have been sentenced had he been sentenced to state prison.

Sections 2930 through 2932 describe the methods and standards by which the term of confinement of a person sentenced to the Department of Corrections may have his term reduced by up to one-third. The possible reduction is based upon a combination of the prisoner's forebearance from certain specified acts and "upon participation in work, educational, vocational, therapeutic or other prison activities." (§ 2931, subds. (b), (c).) The maximum credit which may be lost for each incident involving prohibited behavior or failure to participate is described. An individual may not be penalized if he has made a reasonable effort to

partake of the enumerated activities or is unable to do so for reasons beyond his control. (§ 2931, subds. (b)(3), (c); Cal. Admin. Code, tit. 15, § 3043.) A prisoner has the right to notice and hearing whenever the Department of Corrections seeks to deny conduct credits. (§ 2932.)

Defendant relies on *People* v. *Olivas, supra,* in which we held that a misdemeanant between the ages of 16 and 21, sentenced to YA under Welfare and Institutions Code section 1731.5, could not be held in YA confinement for a term longer than that to which a person, similarly convicted as an adult, could be sentenced if not committed to YA. Invoking equal protection principles, defendant argues that in like fashion an adult youthful offender committed to YA must be entitled to those same conduct credits available to a similar offender sentenced to prison. We disagree.

The thesis of our *Olivas* holding was that "personal liberty is a fundamental interest, second only to life itself, as an interest protected under both the California and United States Constitutions." (17 Cal.3d at p. 251.) Accordingly, "once it is determined that the classification scheme affects a fundamental interest or right the burden shifts. Thereafter *the state* must first establish that it has a *compelling* interest which justifies the law and then demonstrate that the distinctions drawn by the law are *necessary* to further that purpose." (*Ibid.*, italics in original.) After agreeing that the state had an interest in rehabilitating youthful offenders we stated "we have not been shown how this sentencing scheme is necessary to further that interest. Assuming arguendo that rehabilitation is a compelling state interest, we cannot determine what minimum period of confinement is sufficient to achieve the state's goal of meaningful rehabilitation" (*id.*, at p. 255), and concluded that youthful offenders could not be held for a maximum term in excess of that for which other adult offenders could be confined.

The case before us is distinguishable from *Olivas.* We are not confronted here with the *maximum* term for which a youthful offender may be held, but rather the method by which he may obtain release prior to expiration of the full term imposed.

When *Olivas* was decided in 1976 youthful offenders were sentenced either to YA or to prison under the Indeterminate Sentence Law (ISL). At that time, "the purposes of imprisonment were deterrence, isolation and rehabilitation.... Not the least of these was rehabilitation." (*In re Eric J., supra,* 25 Cal.3d 522, 531.) Under the ISL no person, whether

in YA or Department of Corrections custody, was entitled to a statutorily prescribed amount of conduct credit. Then the Legislature enacted the Determinate Sentencing Act specifically reciting that it "finds and declares that the purpose of imprisonment for crime is punishment." (§ 1170, subd. (a)(1).) No change, however, was made in the declaration of legislative intent regarding the establishment of YA: "The purpose of this chapter is to protect society more effectively by substituting for retributive punishment methods of training and treatment directed toward the correction and rehabilitation of young persons found guilty of public offenses. To this end it is the intent of the Legislature that the chapter be liberally interpreted in conformity with its declared purpose." (Welf. & Inst. Code, § 1700.)

The state's interest in the treatment and rehabilitation of various categories of criminal offenders is well established. Thus, in *People v. Saffell* (1979) 25 Cal.3d 223 [157 Cal.Rptr. 897, 599 P.2d 92], we noted that "While judicial attention to the [mentally disordered sex offender (MDSO)] is invoked by his commission of a criminal act, the entire statutory scheme providing for the diversion of MDSOs from the mainstream of the criminal justice system clearly indicates that 'in MDSO cases, subsequent confinement of the ... person is for purposes of *treatment*, not punishment.' (*In re Moye* [1978] 22 Cal.3d 457 at p. 466 [149 Cal.Rptr. 491, 584 P.2d 1097], italics in original. . . .)" (25 Cal.3d, at p. 229.) Similarly, in *In re Eric J.*, we considered the scheme for commitment of minors to YA, and, in conformity with the legislative declaration, reaffirmed that such commitments were for "the purposes of treatment and rehabilitation (*In re Aline D.* (1975) 14 Cal.3d 557, 567 . . .)." (25 Cal.3d at p. 531.) Rehabilitation of youthful offenders benefits the state by assisting those who because of their youth and background may be more amenable to rehabilitation and thereby become productive and law-abiding citizens.

In considering the matter of credits, we observed in *People v. Sage, supra*, "language in sections 2930, 2931 and 2932 clearly indicate[s] that the Legislature contemplated the credits governed by these sections would be *earned in prison*." (26 Cal.3d, at p. 506, italics added.) The primary purposes of conduct credits for prison inmates are to encourage conformity to prison regulations, to provide incentives to refrain from criminal, particularly assaultive, conduct, and to encourage participation in "rehabilitative" activities. (*People v. Saffell, supra*, 25 Cal.3d, at p. 233; *People v. Reynolds* (1981) 116 Cal.App.3d 141, 147 [171 Cal.Rptr. 461].)

In contrast to the rigid rules governing application of conduct credits for those committed to state prison, youthful offenders who are sentenced to YA are entitled to consideration of their in-custody behavior under a different set of guidelines which are consistent with both the indeterminate aspects of YA commitments and the declared legislative intent. In-custody behavior of YA committees is considered as being relevant to the YA rehabilitative and corrective goals, rather than as a mere aid to maintaining order in the facility. (See, e.g., Cal. Admin. Code, tit. 15, §§ 4945, subd. (i) [behavioral factors relevant to deviating from "prescribed parole consideration date"], subd. (j) [behavioral factors relevant to modifying established parole consideration date], 4995 [honorable discharges from YA supervision].)

In passing, we note our concurrence with the Chief Justice's reference to "the advantages of being a youthful offender" (dis. opn., *post*, p. 167) because of the less rigid consideration of juvenile conduct while in YA. The case before us fully supports her conclusion. At oral argument defense counsel acknowledged the release of defendant from YA confinement in April 1981, months *before* he could have obtained discharge from his incarceration had he been sentenced as an adult to prison and had he been afforded every possible applicable conduct credit authorized by the Penal Code.

We stressed in *In re Eric J.* that, "under the Determinate Sentencing Act rehabilitation is no longer the standard for term fixing" (25 Cal.3d, at p. 532) in adult sentencing. Rehabilitation, however, remains the standard in YA commitments, and YA committees may be released earlier—or later—than their imprisoned counterparts under the behavioral guidelines enumerated in the Administrative Code and the Youth Authority Act. It follows that imposition of the Penal Code provisions for conduct credits upon YA commitments would "provide the youthful felon with what he already has: the opportunity to reduce his time in confinement because of his conduct." (*People* v. *Reynolds, supra*, 116 Cal.App.3d at p. 147.) As the *Reynolds* court aptly put it, "The fact that a youthful felon in the Youth Authority is not given Penal Code behavior credit does not mean that he is denied recognition and reward for good behavior. Participation in rehabilitative programs and behavioral conformity is encouraged and rewarded in Youth Authority commitments because of the indeterminate nature of the commitment itself, with release at the discretion of the Youthful Offender Parole Board." (*Ibid.*)

So viewed, conduct credits have meaning only within the context of a fixed term. (See *People* v. *Saffell, supra*, 25 Cal.3d, at pp. 233-234.) In 1947, this principle was specifically recognized by the Legislature in former section 2926. In connection with the question of similar conduct credits available to prisoners received in state prison after January 1, 1948, the 1947 amendment to the section provided the following: "It is the intention of the Legislature, recognizing the inconsistency of applying a statutory system of credits to a prison term fixed under the indeterminate sentence law, to abolish by this act the statutory system of credits now in use in the prisons of this State." (Stats. 1947, ch. 1381, § 1, p. 2944.) The Legislature's continued refusal to apply the fixed system of conduct credits to YA committees is fully consistent with this intent which was legislatively expressed as to the former ISL.

Moreover, we note that conduct credits because of the very nature of certain YA commitments would have a limited effect. Thus, while generally persons committed to YA may be released earlier than their state prison counterparts, in some instances, those convicted of felonies and sentenced to YA must be released long before their state prison terms would terminate even if full conduct credits were awarded. Welfare and Institutions Code section 1771 provides that "Every person convicted of a felony and committed to the authority *shall* be discharged when such person reaches his 25th birthday, unless an order for further detention has been made by the committing court pursuant to Article 6 . . . or unless a petition is filed under Article 5 of this chapter." (Italics added.) Thus, a 20-year-old, sentenced to a 15-year term, would, if sent to state prison be released at the earliest after serving 10 years, or at age 30. Under the Youth Authority Act, however, he or she must be freed at age 25 unless the Youthful Offender Parole Board petitions the court for further incarceration pursuant to Welfare and Institutions Code sections 1780 and 1783. Application of any conduct credits during YA commitment to the maximum term of incarceration, namely, 15 years, accordingly would be an idle act because it would have no effect on the term for which the felon might be held in such confinement.

It is significant that the Youthful Offender Parole Board in setting parole dates for committees considers factors which are relevant to the award of conduct credits to state prison inmates. (See Cal. Admin. Code, tit. 15, §§ 4945, subds. (i), (j), 4995.) Because of the indeterminate nature of YA commitments and the discretionary power vested in the parole board to consider behavioral factors combined with the continuing rehabilitative nature of YA confinement, we hold that the

refusal to apply sections 2930 through 2932 to YA confinement does not offend equal protection. The compelling state interest in rehabilitation of youth offenders and the flexible and individual consideration given to the conduct of YA committees in determining the length of their YA confinement are necessary to advance the stated purposes of the Youth Authority Act.

Our foregoing conclusion relative to behavioral credit applies equally to presentencing conduct credit claimed by those in YA confinement. Although credit is given for *actual* time spent in presentence custody (Cal. Admin. Code, tit. 15, § 4945, subd. (e); § 2900.5) no automatic conduct credit is authorized for such incarceration. Consideration will be given to the effect that the "ward's experiences and behavior while in local custody have on the ward's training and treatment needs" in setting the ward's parole consideration date. (Cal. Admin. Code, tit. 15, § 4945, subd. (d).)

Our recent holding in *People* v. *Sage, supra,* 26 Cal.3d 498, does not require a contrary result. There the concern was whether conduct credits should be given for presentence custody to a person ultimately committed to prison. We determined that such credits were not statutorily mandated. Nonetheless, because of the automatic nature of the application of conduct credits to the length of prison terms, we held that it was a denial of equal protection to deny such credits to persons who were in jail custody before sentencing who would otherwise be required to spend a longer time in actual incarceration than those who only spent time in prison. *Sage* differs from the present case because, unlike persons sentenced to prison, adults who are committed to YA will not have their custody period in YA modified by any automatic application of conduct credits, so that application of such credits to any presentence period of custody is not required by equal protection.

The judgments are reversed and the causes remanded for resentencing in accordance with the requirements of sections 1170 and 1170.1 and the sentencing rules of the Judicial Council. We affirm the trial court's denial of conduct credits for the period defendant was in custody prior to sentencing, and further deny the petition for writ of habeas corpus seeking similar credits for the period of confinement in YA.

Tobriner, J., Mosk, J., Hanson (Thaxton), J.,* and Morris, J.,* concurred.

*Assigned by the Chairperson of the Judicial Council.

**NEWMAN, J., Dissenting.**—To forbid unequal sentences and at the same time permit unequal confinements accords too much deference, I believe, to the word "rehabilitation." The discretion allowed appears to me to be almost unconfined and vagrant. (Cf. my dis. opns. in *In re Eric J.* (1979) 25 Cal.3d 522, 538 [159 Cal.Rptr. 317, 601 P.2d 549]; *People v. Saffell* (1979) 25 Cal.3d 223, 235 [157 Cal.Rptr. 897, 599 P.2d 92]; *People v. Sage* (1980) 26 Cal.3d 498, 511 [165 Cal.Rptr. 280, 611 P.2d 874].)

**BIRD, C. J.**—I respectfully dissent.

The majority find that a discriminatory statute, which allows adults to be released after serving two-thirds of their prison term but denies the same right to "youthful offenders" committed to the Youth Authority, does not violate the equal protection clause of the Constitution. By this holding, this court endorses the anomaly that an individual who is sentenced to the Youth Authority may be incarcerated for a period of time *50 percent longer* than another individual sentenced to prison although *both* were convicted of (1) the same crime, (2) in the same court and (3) given precisely the same term. Ah, the advantages of being a youthful offender!

In *People v. Olivas* (1976) 17 Cal.3d 236 [131 Cal.Rptr. 55, 551 P.2d 375], this court held that liberty is a fundamental interest and a classification scheme, which offends such an interest, cannot withstand constitutional scrutiny unless the state can establish a compelling state interest in maintaining the discriminatory distinctions. *Olivas* recognized that youthful offenders were treated differently than adult offenders and "subjected to significantly greater terms of incarceration as a result of those convictions solely by reason of their age." (*Id.*, at p. 243.) The court went on to declare "such a sentencing scheme constitutes a denial of equal protection . . . ." (*Ibid.*)

The principles enunciated in *Olivas* have been applied by the Courts of Appeal repeatedly to prevent youthful offenders from being subject to any confinement or custody greater than that they would face if they had been sentenced to prison rather than committed to the Youth Authority.

In *People v. Sandoval* (1977) 70 Cal.App.3d 73, 89 [138 Cal.Rptr. 609, 99 A.L.R.3d 765], the Court of Appeal held that denying credit to youthful offenders for time spent in custody prior to Youth Authority

commitment violated equal protection since adults sentenced to prison received such credits pursuant to Penal Code section 2900.5. The *Sandoval* court recognized that youthful offenders were a subclass of people sentenced to imprisonment by the criminal courts. To deny them such credits would be discriminatory. (*Ibid.*) In *Sandoval*, the court noted that "*Olivas* would appear to compel our conclusion . . . ." (*Ibid.*)

Similarly in *People* v. *Franklin* (1980) 102 Cal.App.3d 250, 253-254 [162 Cal.Rptr. 284], the Court of Appeal applied *Olivas* and recognized that youthful offenders could not have a greater period of parole control than prisoners sentenced to state prison for the same offenses.

Indeed, *People* v. *Vasquez* (1979) 94 Cal.App.3d 42, 46-51 [156 Cal.Rptr. 235], indicated that *Olivas* compelled the recognition of conduct credits for youthful offenders, the very issue presented in this case. "The CYA, conformable to the precepts of *People* v. *Olivas, supra*, 17 Cal.3d 236 [131 Cal.Rptr. 55, 551 P.2d 375], has the authority and obligation to award [this youthful offender], if he can establish entitlement under the statutes and regulations, good behavior/performance credit of one-third off . . . ."[1] (*Id.*, at p. 49.)

While the *Olivas* rationale is recited in the majority opinion, the majority refuse to apply it because they find this case somehow distinguishable. The majority's attempts to set down purported distinctions cannot withstand close scrutiny.

The first purported distinction the majority find between the present case and *Olivas* is that the issue here involves when a release may be obtained prior to the expiration of the full term, not an inequality of terms. (Maj. opn., *ante*, at p. 162.) However, this is a distinction without a difference because the fundamental liberty interest involved is the same. The impact on the liberty interest made by the statutory classification must be measured by the length of *actual deprivation.*

A well-behaved prisoner in state prison, who participates in work programs, will be released after service of two-thirds of the "term of imprisonment" by virtue of Penal Code sections 2930 through 2932. A

---

[1]The only Court of Appeal decision to the contrary was the two-to-one decision in *People* v. *Reynolds* (1981) 116 Cal.App.3d 141 [171 Cal.Rptr. 461], cited by the majority. I would disapprove that decision. (See dis. opn. of Feinberg, J., 116 Cal.App.3d at p. 148.)

well-behaved, participating youthful offender sentenced to the same term for the same offense may be incarcerated for the entire term under the present statutory scheme.[2] In such a situation, how can anyone claim that this classification scheme does not affect a fundamental interest? The fact that the imposed terms of imprisonment were equal theoretically does not negate the harsh reality that the youthful offender may serve an increased period of incarceration simply because he is a youthful offender and is denied good conduct credits.[3] Youthful offenders are still "singled out for potentially longer terms of incarceration" than adult prisoners in similar circumstances. (*People* v. *Olivas, supra*, 17 Cal.3d at p. 242.)

The majority opinion holds that longer incarceration of youthful offenders is necessary to advance the state's interest in their rehabilitation. (Maj. opn., *ante*, at pp. 162-163, 165-166.) The same argument was advanced and rejected in *Olivas*: "Even though we agree that the state has an interest in the rehabilitation of youthful offenders we have not been shown how this sentencing scheme is necessary to further that interest." (*People* v. *Olivas, supra*, 17 Cal.3d at p. 255.) Similarly, there has been no showing here that the subjection of well-behaved, participating youthful offenders to a period of incarceration 50 percent longer than adult convicts sentenced to prison is necessary to further the

---

[2]It is true, as the majority opinion notes, that a youthful offender, by virtue of the provisions of Welfare and Institutions Code section 1771 which require discharge at age 25, may not have to serve the entire term if the term by chance is lengthy. However, it cannot be denied that many youthful offenders have sufficient time between their commitments and their 25th birthdays to complete their full terms of imprisonment. Thus, they are exposed to potentially longer incarceration than adult offenders sentenced to state prison.

[3]The majority opinion attempts to seize on the verbal formulation of "maximum term" in *Olivas* to distinguish it from this case. (Maj. opn., *ante*, at p. 162.) *Olivas* did use the phrases "maximum jail term" (17 Cal.3d at p. 239, 257), and "maximum permissible jail sentence" (*id.*, at p. 242), but it also discussed "terms of incarceration." (*Id.*, at p. 257.)

No approval of the majority's mode of analysis can be drawn from these verbal formulations used in *Olivas*. When *Olivas* was decided there were no conduct credits available when a person was sentenced to county jail or prison. Penal Code section 4019, relating to conduct credits in county jail facilities, did not take effect until January 1, 1977. (Stats. 1976, ch. 286, § 4, p. 595.) Sections 2930 through 2932 relating to prison conduct credits, did not become operative until July 1, 1977. (Stats. 1976, ch. 1139, § 276, p. 5146, amended by Stats. 1977, ch. 2, § 4, pp. 8-9, and Stats. 1977, ch. 165, §§ 37-39, pp. 661-664.)

Thus the "maximum jail term" that an adult could receive could not be reduced by conduct credits at the time *Olivas* was decided. The "maximum jail term" was equal to the time actually served by one sentenced to the maximum term.

state's rehabilitative interests. The hard questions posed by this issue in *Olivas* are virtually unanswered by the majority opinion. "What is to limit the Legislature from expanding the inequality . . . to allow rehabilitative detention of youthful offenders until they are 30 or 40 years old or for life? . . . [W]hat other constitutional provision [than equal protection] would bar a statute permitting the lifelong confinement of marginally incorrigible misdemeanant shoplifters, for example, under the beneficent guise of rehabilitative treatment?" (*Ibid.*, fn. omitted.)

The majority evidently take it as an article of faith that incarceration that may be 50 percent longer than that meted out as punishment is necessary for rehabilitation of youthful offenders. By means of this vast, unsupported and unwarranted assumption, the majority find the compelling state interest test set forth in *Olivas* has been satisfied. The folly of this view was exposed nearly a quarter of a century ago by the drafters of the Model Penal Code: "We recognize the theory of provisions of this kind [permitting longer confinement of youthful offenders], that such a longer term is more reformative than a short, definite sentence to jail. This is a case, however, where we think that theory has outrun a sense of just proportion. Simple regard for personal liberty—of young no less than of mature adults—requires, in our view that younger people not be subject to more onerous sentences because of their immaturity." (Model Pen. Code, § 6.05, com. (Tent. Draft No. 7, May 3, 1957), quoted with approval in *People v. Olivas, supra,* 17 Cal.3d at p. 254.)

In an effort to justify the denial of conduct credits to youthful offenders the majority attempt to use as authority for their position *People v. Saffell* (1979) 25 Cal.3d 223 [157 Cal.Rptr. 897, 599 P.2d 92]. *Saffell* held that mentally disordered sex offenders (MDSO's) were not entitled to a reduction of their maximum hospital commitment period by the one-third conduct credits provided state prisoners by Penal Code sections 2930 through 2932. This result was reached in *Saffell* by holding that "[t]he confinement term of a prisoner and the commitment of an MDSO are essentially different in nature. . . . [T]he commitment of an MDSO offender, designed primarily for treatment, results from a proceeding separate from the criminal action." (*People v. Saffell, supra,* 25 Cal.3d at p. 230.)

As the *Saffell* court noted, a person cannot be denominated an MDSO unless it is proven, in a proceeding separate from the criminal action, that "'by reason of mental defect, disease, or disorder, [he] is

predisposed to the commission of sexual offenses to such a degree that he is dangerous to the health and safety of others.'" (Welf. & Inst. Code, § 6300; quoted in *People* v. *Saffell, supra*, 25 Cal.3d at p. 226.)

Contrast this with a youthful offender who is committed to the Youth Authority after being sentenced in a criminal proceeding in exactly the same fashion as an offender who is sent to state prison. "[C]ommitment to the authority is a pronouncement of the sentence for the offense." (*People* v. *Navarro* (1972) 7 Cal.3d 248, 271 [102 Cal.Rptr. 137, 497 P.2d 481].) No proceedings or findings separate from the criminal proceedings are involved in a Youth Authority commitment. The majority opinion's equation of youthful offenders with MDSO's is not only misplaced, it is simply wrong. The analysis in *Saffell* makes this fact crystal clear.

Other reasons given in *Saffell* for denying MDSO's who are committed to hospitals the same type of credits given to state prisoners are similarly inapplicable to youthful offenders incarcerated in the Youth Authority. In *Saffell*, the court was concerned that good conduct credits for MDSO's might interfere with the therapeutic relationship between hospital officials and their mentally disturbed patients. (*People* v. *Saffell, supra*, 25 Cal.3d at p. 234.) No such danger is involved here. Further, the court in *Saffell* was concerned that state hospitals might lack the type of "'work, educational, vocational [or] therapeutic'" activities in which MDSO's could participate to satisfy the requirements of Penal Code section 2931, subdivision (c). (*Ibid.*) The Youth Authority has such programs. (See Welf. & Inst. Code, § 1768; Cal. Admin. Code, tit. 15, § 4760 et seq.)

The administration of conduct credits for MDSO's was thought to be beyond the ability or resources of state hospital officials. As a result, the court did not want to impose such a duty. (*People* v. *Saffell, supra*, 25 Cal.3d at p. 234.) The Youth Authority does not lack the administrative expertise or resources for such a program. It already has in operation administrative procedures for the setting and extension date of a youthful offender's parole consideration. (See Cal. Admin. Code, tit. 15, §§ 4621, 4630 et seq., 4945, subds. (i) and (j).)

The majority opinion states that conduct credits "have meaning only within the context of a fixed term." (Maj. opn., *ante*, at p. 165.) In so doing, they overlook the fact that a youthful offender's term is fixed in

precisely the same fashion as a defendant sentenced to prison. (Cal. Rules of Court, rule 453.)

In deciding whether a youthful offender is to receive a mitigated, mid-term or aggravated term or whether multiple offense terms are to be served concurrently or consecutively, the judge considers the same factors as he or she would if the offender were an adult. Thus, the terms are the same from which good conduct credits would be deducted, whether the person were sentenced to prison or the Youth Authority. The language of *People v. Sandoval, supra,* 70 Cal.App.3d at page 91 is instructive. "There is ... no difficulty inherent in applying such credit against the maximum term an adult felon sentenced to prison could be held and then limiting the CYA commitment to the resulting remainder."

The majority's reliance on a 1947 declaration of the Legislature that conduct credits are inconsistent with the Indeterminate Sentence Law is also misplaced. (Maj. opn., *ante,* at p. 165.) This 1947 amendment has little application to the situation at hand. A Youth Authority commitment is not comparable to a sentence under the old Indeterminate Sentence Law as it operated in 1947.[4] As noted above, the Youth Authority term is determined in the identical manner as a Determinate Sentencing Act term, with the length of term tailored to the circumstances of the offense. (Pen. Code, §§ 1170, 1170.1; Cal. Rules of Court, rule 453.) Under the Indeterminate Sentence Law, all defendants convicted of the same offense received the same indeterminate sentence.

_____

[4] A more recent and relevant legislative indication that conduct credits *are appropriate* for rehabilitative alternatives to a prison sentence may be found in Welfare and Institutions Code section 3201 as amended in 1980. (Stats. 1980, ch. 822, § 8, No. 6 West's Cal. Legis. Service, p. 2617, No. 4 Deering's Adv. Legis. Service, p. 723.) These modifications relate to the computation of maximum confinement time for criminal defendants who are committed to the California Rehabilitation Center (CRC) because of narcotics addiction. The new legislative enactment in essence requires the judge to sentence any narcotics addict to a term computed in the same fashion as a defendant sentenced to state prison or committed to the Youth Authority. (Welf. & Inst. Code, § 3051, as amended by Stats. 1980, ch. 822, § 1, No. 6 West's Cal. Legis. Service, p. 2615, No. 4 Deering's Adv. Legis. Service, p. 721.) The imposition of that sentence is then suspended upon commitment to CRC. The maximum confinement time permitted under the subsequent commitment is set at the computed term *with* application of the good behavior and participation credit provisions of Penal Code section 2930 et seq. (Welf. & Inst. Code, § 3201, subd. (c).)

The existence of this statute creates yet another equal protection issue: May the Legislature discriminate between two groups of offenders who are being "rehabilitated" in the calculation of their maximum confinement times? No compelling state interest in discriminating between youthful offenders and narcotics addicts leaps to mind.

That term was not determined by reference to whether the crime was aggravated or mitigated in nature. The trial judge was specifically instructed not to "fix the term or duration of the period of imprisonment." (Former Pen. Code, § 1168, amended by Stats. 1941, ch. 106, § 13, p. 1083.) The Indeterminate Sentence Law's "terms prescribed by law" in 1947 had for the most part very large ranges and very high maximum possible terms.[5]

The only similarity between a current Youth Authority commitment from adult court and the Indeterminate Sentence Law is the power of the executive branch to make a parole release decision at virtually any time after commitment. (See Welf. & Inst. Code, § 1766.) It is this facet of the Youth Authority commitment which appears to be central to the majority's decision that ". . . Y. A. committees may be released earlier—or later—than their imprisoned counterparts. . . ." (Maj. opn., *ante*, at p. 164.) The majority appear to have reverted to a "quid pro quo" analysis, wherein a youthful offender is compelled to pay for the possibility of an early release by having to accept the reality that his incarceration period may be longer than that served by a defendant sentenced to prison. This rationale was rejected in *Olivas* when the court refused to endorse a variant of the "quid pro quo" justification advanced by the state. There, it was argued that the "amenities" of the Youth Authority, as compared to prison, justified longer confinement. (*People* v. *Olivas, supra*, 17 Cal.3d at p. 253.) This argument was forcefully rejected by this court. "[W]hen we attempt to square the quid pro quo rationale with fundamental interest analysis, we find it constitutionally inadequate. . . . Moreover, such an argument presupposes that defendant's interest in freedom from incarceration is a fungible commodity which can be casually traded, albeit involuntarily, like apples or oranges." (*Ibid.*) The fact that the state deems some offenders capable of rehabilitation and provides for their release as soon as that goal is reached is no justification in law or logic for extending the incarceration of youths beyond the period meted out to those being punished in state prison for identical conduct.

---

[5]Thus, the Indeterminate Sentence Law's penalty for unarmed robbery was one year to life. (Former Pen. Code, §§ 213, 671.) The penalty for forcible rape was three years to life. (Former Pen. Code, § 264.) First degree burglary was punishable by five years to life. (Former Pen. Code, § 461.) Indeed, in a sentencing system where there were many crimes punishable by a maximum of life imprisonment, a provision for conduct credits was difficult, since there was no known maximum term calculable in years from which to subtract credits. (Cf. *In re Kapperman* (1974) 11 Cal.3d 542, 546-547 [114 Cal.Rptr. 97, 522 P.2d 657].)

Next, the majority seek to justify their ruling by the assertion that institutional good conduct and participation in programs are already taken into consideration in the setting of parole dates for youthful offenders. (Maj. opn., *ante*, at p. 164.) Although behavior and participation are included in a laundry list of some 16 factors to be considered when deviating from a particular parole date, a youthful offender is not entitled to a one-third reduction as is the adult offender. (See Cal. Admin. Code, tit. 15, § 4945, subd. (i).) In the prison setting, good conduct and participation give the prisoner a right to a reduction in his sentence. If that right is denied, there is administrative appeal as well as the possibility of judicial action. In the Youth Authority, good conduct and credit give the youthful offender no more than a hope that when considered with 15 or more other factors, such conduct may result in an early release date. Good conduct or participation credits are not mandated. In fact the Youthful Offender Parole Board has been given the discretion to ignore the good conduct if one or more of the other factors tips the scale in favor of nonrelease. Surely, mere consideration of good conduct is not treatment equal to the statutory entitlement to credit provided to state prison inmates.

Finally, the majority seek solace in the fact that denial of good conduct credits will have a "limited effect" in that the maximum confinement, even if computed with the grant of one-third conduct credits, is not reached by many youthful offenders due to the length of their terms and/or their proximity to their 25th birthday. (Maj. opn., *ante*, at p. 165.) While it is somewhat comforting that the statutory scheme does not deprive each and every youthful offender of equal protection of the laws, the scheme is clearly unconstitutional as it affects those youthful offenders who will be required to serve longer periods of incarceration than offenders who are convicted of identical conduct and who are sentenced to state prison.

The issue of good conduct credit for precommitment confinement in local facilities depends on how the question involving the Youth Authority is answered. If conduct credits are granted for time spent in an institution after imposition of sentence, then credit must be given for precommitment incarceration suffered by those unable to make bail. (*People* v. *Sage* (1980) 26 Cal.3d 498 [165 Cal.Rptr. 280, 611 P.2d 874].) If *Olivas* and equal protection principles require conduct credits for time spent at the Youth Authority, conduct credits must also be

provided for precommitment incarceration. To hold otherwise is to turn aside the mandates of the Constitution. Sadly, that is what the majority have done.