[Crim. No. 13641. Fourth Dist., Div. One. Nov. 23, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD MILTON HANKINS, Defendant and Appellant.

**Counsel**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Victoria Sleeth, Deputy State Public Defender, and Gary Bubis for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Steven V. Adler and Michael D. Wellington, Deputy Attorneys General, for Plaintiff and Respondent.

**Opinion**

**MOON, J.\*—**

### Facts

After pleading guilty to possession of amphetamines (Health & Saf. Code, § 11378) pursuant to a stipulation that his sentence would run concurrent with any sentence imposed on another felony case, Richard Milton Hankins was referred for a narcotics evaluation under Welfare and Institutions Code section

---

*Assigned by the Chairperson of the Judicial Council.

3051. After spending 175 days at the California Rehabilitation Center (CRC), he was found unamenable to treatment. Criminal proceedings were reinstated and Hankins was sentenced to the upper term of three years. As against this term, the trial court gave Hankins credit for: 113 days actual local time; 57 days conduct credit (local time); 175 days actual CRC time (amended upward from 144 days actual).

The trial court gave no conduct credit for his actual CRC time. Hankins contends the judgment should be modified to give him good time/work time credits (hereinafter conduct credit) for the 175 days at CRC.

### ISSUES

1. Does Welfare and Institutions Code[1] section 3201, subdivision (c), entitle appellant to conduct credit for CRC?

2. Do principles of equal protection require the trial court to give appellant conduct credit for CRC time?

### DISCUSSION

*Welfare and Institutions Code section 3201, subdivision (c):*
■ The Attorney General correctly argues this section is not a conduct credit entitlement statute.[2]

While taking into account conduct credits which a state prison inmate may acquire under Penal Code section 2931, the section does not give the CRC patient

---

[1]All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]Section 3201, subdivision (c), reads in pertinent part: "Any person committed pursuant to Article 2 (commencing with Section 3050), whose execution of sentence in accordance with the provisions of Section 1170 of the Penal Code was suspended pending a commitment pursuant to Section 3051, who has spent, pursuant to this chapter, a period of time in confinement or in custody, excluding any time spent on outpatient status, equal to that which he or she would have otherwise spent in state prison had sentence been executed, including application of good behavior and participation credit provisions of Article 2.5 (commencing with Section 2930) of Chapter 7 of Title 1 of Part 3 of the Penal Code, shall, upon reaching such accumulation of time, be released on parole under the jurisdiction of the Narcotic Addict Evaluation Authority subject to all of the conditions imposed by the authority and subject to the provisions of Article 1 (commencing with Section 3000) of Chapter 8 of Title 1 of Part 3 of the Penal Code. . . .

"Except as otherwise provided in the preceding paragraph, or as otherwise provided in Section 3200, the period of commitment, including outpatient status, for persons committed pursuant to Section 3051, which commitment is subsequent to a criminal conviction for which execution of sentence to state prison is suspended, shall equal the term imposed under Section 1170 of the Penal Code, notwithstanding good time and participation credit provisions of Article 2.5 (commencing with Section 2930) of Chapter 7 of Title 1 of Part 3 of such code. Upon reaching such period of time, such person shall be released on parole under the jurisdiction of the Narcotic Addict Evaluation Authority subject to all of the conditions imposed by the authority and subject to the provisions of Article 1 (commencing with Section 3000) of Chapter 8 of Title 1 of Part 3 of the Penal Code. . . . "

pro rata conduct credits. The section is an in-custody jurisdictional limit on the Narcotic Addict Evaluation Authority. The patient must be paroled from CRC when he or she has spent either (1) an amount of time in custody at CRC equal to two-thirds of the state prison sentence imposed, or (2) an amount of time equal to the full state prison sentence in a combination of inpatient and outpatient status in the civil addict program. The section is silent as to what conduct credits, if any, an inpatient who is terminated from the CRC program may be entitled to receive.

### *Equal Protection*

Hankins relies on *In re Martin* (1981) 125 Cal.App.3d 896 [178 Cal.Rptr. 445], in which the First District Court of Appeal held equal protection requires conduct credits be afforded those who do not complete their terms at CRC as well as those who successfully complete the program. The *Martin* court found that otherwise section 3201, subdivision (c), creates an unjustifiable classification between CRC inmates who complete the program and receive conduct credits and those inmates who do not complete their terms at CRC.

Six months after *Martin,* the Second District Court of Appeal held outpatient credits should not be awarded under the second paragraph of section 3201, subdivision (c), to one who absconds from CRC. (*In re Taylor* (1981) 132 Cal.App.3d 260 [183 Cal.Rptr. 34].) The *Taylor* court found a sound justification for distinguishing those who successfully complete the CRC program from those who abscond from it, since the availability of credit upon completion is an incentive for continued participation in the program. (*Id.,* at p. 264.)

*Taylor* and *Martin* are distinguishable. First, Taylor absconded from CRC, while Martin, like Hankins, was found unsuitable for further treatment. On the facts, the *Martin* court held equal protection requires equal treatment of those who successfully complete CRC terms and *those who are found unamenable to treatment*. The *Taylor* court found a sound justification for distinguishing between those who complete their CRC terms and *those who abscond*. The availability of credit is a "powerful incentive" to discourage inmates from absconding (*Taylor, supra,* 132 Cal.App.3d 260, 264), but may have little effect on inmates who are simply unamenable to treatment.

Second, Taylor sought outpatient credit;[3] Martin, like Hankins, claimed conduct credit. Noting that "[t]ime spent on outpatient status is not the equivalent

---

[3]In fact, Taylor had been awarded conduct (behavior) credits. In denying his petition to have the behavior credits disregarded and his outpatient time credited instead, the court impliedly approved the award of conduct credits to a CRC inmate who absconds. Since Hankins did not abscond but was found unamenable to treatment, we do not decide whether conduct credits should be awarded to a CRC inmate who absconds before completing the program.

of time spent in custody" (*Taylor, supra,* at p. 264), and relying on the legislative intent to delete outpatient credit in the 1977 amendment to Penal Code section 1203.03, subdivision (g)[4] (*id.,* at p. 263), the *Taylor* court refused to credit Taylor with outpatient time. In contrast, the *Martin* court noted no similar legislative proscription regarding conduct credit in a custodial setting. Instead, "[t]he Legislature does not intend an addict to be treated for longer than he could be imprisoned and it intends the 'credit' to apply irrespective of the nature of his conduct while in CRC." (*Martin, supra,* 125 Cal.App.3d 896, 902.)

The Attorney General contends these distinctions are irrelevant. Citing *People* v. *Austin* (1981) 30 Cal.3d 155, 163 [178 Cal.Rptr. 312, 636 P.2d 1], and *In re Ricky H.* (1981) 30 Cal.3d 176, 190 [178 Cal.Rptr. 324, 636 P.2d 13],[5] the People argue the state has a "well-established" and "compelling" interest in treatment and rehabilitation. Such rehabilitation can only be obtained if there are incentives for success and disincentives for failure.[6] In *People* v. *Saffell* (1979) 25 Cal.3d 223 [157 Cal.Rptr. 897, 599 P.2d 92], our Supreme Court applied the "compelling state interest" criteria in ruling that an MDSO inpatient cannot earn conduct credits available to inmates of correctional institutions: "We conclude that the present MDSO procedures are justified and that there is a dual compelling state interest in providing effective treatment for those disposed to the commission of their particular category of criminal acts, while, at the same time, assuring the safety of the public. (*Id.,* at pp. 232-233.)

In *Saffell,* the court found constitutionally permissible a disparity in treatment between MDSOs and other inmates. The state has a compelling interest in seeing that MDSOs are diverted from the mainstream of the criminal justice

---

[4]Penal Code section 1203.03, subdivision (g), reads: "Time spent by a defendant in confinement in a diagnostic facility of the Department of Corrections pursuant to this section or as an *inpatient* of the California Rehabilitation Center shall be credited on the term of imprisonment in state prison, if any, to which defendant is sentenced in this case." (Italics added.)

[5]In both cases, our Supreme Court held equal protection principles are not violated in denying youthful offenders' conduct credits for both pre- and post-Youth Authority commitments. In *Austin,* the court reasoned, in part, conduct credits have meaning only within the context of a fixed term. A CYA commitment is indefinite and a release date is set based on participation in rehabilitation programs and behavioral conformity. In *Ricky H.,* the court felt granting precommitment conduct credits to CYA wards would create a new disfavored class—juveniles who are committed to CYA but *not detained* prior to commitment. The court also found juveniles committed to CYA are not "similarly situated" to adults sentenced to prison.

[6]One problem with the Attorney General's argument is there has been no showing "unamenability" to CRC treatment necessarily rests upon misconduct while undergoing inpatient treatment. The committed patient might be an exemplary inmate, but because of previous convictions of violent crimes (excessive criminality) or because of a psychological or character defect (other relevant reason), the Director of Corrections might find him "unamenable" to treatment. (§ 3053, subd. (a).) The patient, now prisoner, then loses any claim for conduct credits. Had there been a showing of Hankins' exclusion for misconduct, the People's argument would have more merit.

system for treatment rather than punishment. (*Saffell, supra,* 25 Cal.3d 223, 229.) Concluding its analysis that incentives in the prison system are not suitable within the hospital context,[7] the court stated: "[I]t seems pointless to give an MDSO 'good time' credit against his medical commitment period because section 6316.2 [Welf. & Inst. Code] allows extension of the treatment period if found to be necessary. The concept of 'good time' credit only has meaning within the context of a fixed criminal sentence which may not be so extended." (*Saffell, supra,* at p. 234.) Accordingly, the *Saffell* majority denied MDSOs conduct credit. The dissent,[8] adopting the opinion of this appellate district (Gerald Brown, P. J.), emphasized "some rather curious results." The MDSO, amenable to treatment, committed and recovered, could end up "serving" the full maximum term for a similar unaggravated crime which would net the unamenable MDSO two-thirds of the midterm. (*Id.,* at p. 235.)

In deciding whether Hankins is entitled to conduct credit under equal protection principles, we are cognizant of one fundamental difference between MDSO and narcotic addict confinement. *In practice,* an MDSO commitment is involuntary;[9] the CRC commitment is largely voluntary.[10] What compelling state interest is there in deterring narcotic addicts guilty of crimes from seeking treatment and rehabilitation while in custody? Few, if any, addicts are going to volunteer for CRC commitment knowing that if they are found "unamenable to treatment" they will be deprived of conduct credits.

Is there a sound justification for classifying and treating differently (1) the addict not committed from (2) the addict committed but found not amenable from (3) the addict committed and found amenable? We think not. The first person is

---

[7]*Saffell* is further inapplicable in the present case. Saffell was a committed inpatient at Patton State Hospital and requested conduct credits. Hankins, previously committed to CRC, was remanded to the trial court, criminal proceedings were reinstated, and he was sentenced to state prison, his present place of confinement. The concept of "good time/work time" credit does have meaning within the context of a "fixed criminal sentence," presently being served by Hankins.

[8]We recognize the dissent was addressing only the equal protection issue as it applied to the automatic imposition of the upper term, not on the earning of conduct credits. Nevertheless, conduct credits were necessarily considered in the dissent's analysis.

[9]MDSO commitment is now controlled by Penal Code section 1364 (eff. Jan. 1, 1982). The last paragraph of this section gives sections 2931 credits for "hospital confinement" after an MDSO is returned to the Director of Corrections for imprisonment.

[10]In making this statement, we are not unmindful of the literal similarities in the commitment processes between section 3051 and section 6302 et seq. (now repealed and supplemented by Pen. Code, § 1364). Theoretically, defendant's lack of motivation is not a factor and one found to be a fit subject may not refuse treatment. (*People* v. *Lopez* (1978) 81 Cal.App.3d 103 [146 Cal.Rptr. 165].) Accordingly, a section 3051 can be involuntary.

Nonetheless, the manner in which trial judges rule on the defendant's fitness for CRC varies. One line of authority suggests a trial judge may consider the same criteria used by CRC, reasoning it is an idle act to send the subject to CRC, only to have him or her returned. (See authorities cited in, but disapproved by, *People* v. *Madden* (1979) 98 Cal.App.3d 249, 261-262 [159 Cal.Rptr. 381].)

afforded conduct credits by statute. (Pen. Code, § 2931.) The third person is afforded conduct credits by operation of law. (Pen. Code, § 2931, through Welf. & Inst. Code, § 3201, subd. (c).) The second person should also enjoy the same status. Each has been convicted of the same crime. Each has been sentenced to the same term. Each receives identical Penal Code section 4019 *presentence* conduct credits. Each is "similarly situated." (*In re Eric J.* (1979) 25 Cal.3d 522 [159 Cal.Rptr. 317, 601 P.2d 549].) While we can conceive of a legitimate purpose for building in a loss of conduct credits for unamenable patients, namely to foster exemplary conduct at CRC, we do not find a compelling state interest for denying those credits. One of the reasons for CRC commitment is to treat addiction and "that such treatment shall be carried out for nonpunitive purposes." (§ 3000.) The People's interpretation of the conduct credit law is inconsistent with this legislative objective. To adopt their position would be to punish the person in the second category who opts for treatment.

We agree with the court's result in *In re Martin, supra,* 125 Cal.App.3d 896; we find *In re Taylor, supra,* 132 Cal.App.3d 260, inapposite. Under principles of equal protection, Hankins should receive conduct credit.

The judgment is reversed as to sentencing only. On remand, Hankins is to be credited with 88 days of CRC conduct credit.

Wiener, Acting P. J., and Work, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied February 23, 1983. Richardson, J., was of the opinion that the petition should be granted.